535 F.2d 1367
 190 U.S.P.Q. 513
 Owen Finlay MACLAREN and Miron Charles Bell, Plaintiffs-Appellees,
v.
B-I-W GROUP INC. and Cross River Products, Inc.,
Defendants-Appellants.
B-I-W GROUP INC., Counterclaim-Plaintiff-Appellant,
v.
Owen Finlay MACLAREN et al., Counterclaim-Defendants-Appellees.
 No. 708, Docket 75-7613.
 United States Court of Appeals,
Second Circuit.
 Argued April 9, 1976.
Decided May 20, 1976.
 
 Joseph C. Sullivan, New York City (Charles R. Hoffmann, Gerald Levy, Kane, Dalsimer, Kane, Sullivan & Kurucz, New York City, Roger W. Parkhurst, Stevens, Davis, Miller & Mosher, Arlington, Va., Francis J. Hone, Brumbaugh, Graves, Donohue & Raymond, New York City, of counsel), for plaintiffs-appellees and counterclaim-defendants-appellees.
 Michael I. Rackman, New York City (Barry A. Cooper, Gottlieb, Rackman, Reisman & Kirsch, P. C., Howard I. Rhine, Zimet, Haines, Moss & Goodkind, New York City, of counsel), for defendants-appellants and counterclaim-plaintiff-appellant.
 Before FRIENDLY, MANSFIELD and MULLIGAN, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 The issue before us on this appeal is the validity of United States Letters Patent No. 3,390,893, issued on July 2, 1968, to plaintiff-appellee Owen Finlay Maclaren with respect to a "collapsible support assembly," suggested as useful for structures such as baby carriages, folding chairs, shopping carts, and the like. Maclaren subsequently licensed the patent to co-plaintiff-appellee Miron Charles Bell for manufacture in the United States. Defendants-appellants B-I-W Group Inc. (hereafter "B-I-W") and Cross River Products Inc.[1] are alleged to have infringed the patent by manufacturing a baby stroller embodying the patent's elements. In addition to responding to plaintiffs' allegations, B-I-W has counterclaimed against the plaintiffs and Bell's sublicensees for a declaratory judgment of invalidity and non-infringement.
 
 
 2
 Maclaren is a British inventor whose prior work largely had been concentrated in the aircraft field. In the mid-1960's he invented a "collapsible support assembly" which was employed in the manufacture of collapsible baby strollers and in 1965 he filed for British Patent No. 1,154,362 for this invention. One year later, on July 18, 1966, he filed a similar application in the United States Patent Office. Following several amendments to the original application, U.S. Patent No. 3,390,893 was issued to Maclaren. It contains 15 claims, the first of which is independent and provides the focal point of this suit, with the other 14 claims representing further refinements or variations. Claim 1 reads:
 
 
 3
 "A collapsible support assembly comprising a bottom cross frame of interpivoted rigid members, a back cross frame of interpivoted rigid members, a two-axes pivot joint interpivotally attaching one of each of the bottom frame members to one of each of the back frame members at each of two corners of said cross frames, said axes being oriented to permit the members of each cross frame to pivot with respect to each other and to permit said cross frames to pivot with respect to each other, two foldable brace members pivotally attached to the bottom cross frame near the other two corners of the bottom cross frame, respectively, and to the back cross frame near the other two corners of the back cross frame, respectively, first releasable means to hold the members of at least one of the cross frames in an extended position when the assembly is unfolded, and second releasable means to hold said brace members in an extended position when the assembly is unfolded."
 
 
 4
 Figure 1 from Maclaren's patent application, illustrating a baby stroller embodying Maclaren's design, is appended to this opinion. A brief description of the patent's design and operation is essential to the issues in this case.
 
 
 5
 The patent defines two interpivoted and rigid cross frames, one at the back and one at the bottom of the mechanism. In Figure 1 the cross frames are represented by the two rigid tubes 1 and 2, pivoted at 3, and tubes 4 and 5 pivoted at 6. When the mechanism is opened, the two X-frames form two planes at approximately a 90o angle to one another. The mechanism is locked into this open position by use of a toggle bar and side braces. In the drawing the two pieces of the toggle bar are marked by 9A and 9B and are connected in the middle by a knuckle joint marked 10. The side braces, represented by 7 and 8 and knuckle-jointed at 7B and 8B, are adjoined to pivots to the back X-frame at 4A and 5A and to the bottom frame at 1A and 2A. When opened, the toggle bar holds the X-frames at their maximum width while the side braces, when fully opened, separate the X-frames at roughly a perpendicular angle.
 
 
 6
 To collapse and fold the mechanism, one breaks knuckle joint 10 at the center of the toggle bar by moving it in an upward direction either by hand or foot. The handles at 7D and 8D are then pressed together by hand. This collapses both X-frames and breaks the pivots 7B and 8B that lock the side braces. As the toggle bar folds, both X-frames narrow; simultaneously, as the side braces unlock and fold, the two collapsed X-frames are rotated toward each other by pushing the handles 7D and 8D forward and downward until, when the structure is folded into a closed position, the side bars bounded by 7B-7D and 8B-8D run parallel to and press against the tubes marked 7C and 8C. The collapsed X-frames then also lie in a position parallel to the collapsed side braces. The result is a compact sticklike mass.
 
 
 7
 In London during the summer of 1969, Alexandre C. Goodwin, chairman of the board and counsel of B-I-W, purchased a Maclaren stroller. Impressed with its design, he consulted D. Deaver Brown, President of B-I-W. Together they decided to pursue the possibility of marketing the stroller in the United States. On December 27, 1969, Goodwin made the initial inquiry to Maclaren. Maclaren informed him that Bell had already been designated as his American licensee. Goodwin and Brown then entered into negotiations with Bell for the purpose of acquiring a sublicense. At the same time, Goodwin, in consultation with a patent attorney, began to have doubts concerning the validity of the Maclaren patent. He expressed these doubts to Bell, who disagreed. In February-March 1970, the negotiations between B-I-W and Bell were abandoned as Bell demanded too high a price for the sublicense.
 
 
 8
 In a meeting held on March 15, 1970, the B-I-W officials decided to manufacture a stroller essentially incorporating the Maclaren design. The first prototype was produced by the middle of the year and B-I-W proceeded to subcontract and market the stroller through a subsidiary. The complaint alleging infringement followed on December 7, 1970, in the United States District Court for the Southern District of New York.
 
 
 9
 There is little room for dispute that if the Maclaren patent is valid, B-I-W is liable for infringement. The trial therefore centered on B-I-W's contentions (1) that the claim language failed to adequately disclose the claimed invention as required by 35 U.S.C. § 112, (2) that the Maclaren patent is invalid for failure to meet the tests of novelty, 35 U.S.C. § 102, and of non-obviousness, 35 U.S.C. § 103, and (3) that the patent must be disallowed under the "late-claiming" doctrine, since a public use of the invention preceded the claims by more than one year, 35 U.S.C. § 102(b). Resolution of these issues unavoidably turned upon technical evaluations of the design and operability of Maclaren's claimed invention as compared to prior patented collapsible support mechanisms employed in such diverse applications as collapsible tents, strollers, and umbrellas. To clarify the issues each side introduced two expert witnesses to comment on the technical, legal, and business aspects of the invention.[2] After a bench trial lasting several days the District Court, Milton Pollack, Judge, on September 19, 1975, filed a carefully reasoned opinion finding the patent to be valid and therefore infringed by defendants' stroller. See 401 F.Supp. 283 (S.D.N.Y.1975). With the finding of infringement, B-I-W's counterclaim for a declaratory statement of non-infringement was dismissed. This appeal followed. We reverse.
 
 DISCUSSION
 
 10
 Before considering the arguments advanced on this appeal, a summary of some basic principles governing the scope of our review in patent cases should be helpful. Although the ultimate question of patent validity is one of law, Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Julie Research Laboratories, Inc. v. Guideline Inst., 501 F.2d 1131, 1136 (2d Cir. 1974), the trial court, as in any other case tried to the bench, must first find the material facts on the basis of the evidence presented to it and then apply governing patent law principles to arrive at its determination of the issue of validity. Guided by Rule 52(a), F.R.Civ.P., we will not ordinarily disturb the district court's findings of fact unless they are found to be "clearly erroneous," Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
 
 
 11
 Our deference to the trial judge's findings is, of course, predicated in large part upon his having had the opportunity to appraise the credibility of the witnesses on the basis of personal observation and, through interrogation, to clarify disputed and often complicated issues of fact. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609-10, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Sakraida v. Ag Pro, Inc., --- U.S. ----, 96 S.Ct. 1532, 47 L.Ed.2d 784, 44 U.S.L.W. 4477 (1976). On the other hand, where the material facts are undisputed or the findings are based on documentary evidence which we are as competent to appraise as the district court, we have not hesitated to reject a determination of validity, either because the significance of the facts had not yet been fully perceived by the district court or there has been an error in the application of legal principles. Julie Research Laboratories, Inc. v. Guideline Inst., supra; Lemelson v. Topper Corp., 450 F.2d 845 (2d Cir. 1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1253, 31 L.Ed.2d 456 (1972); Shaw v. E. B. & A. C. Whiting Co., 417 F.2d 1097 (2d Cir. 1969), cert. denied, 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970); Watsco v. Henry Valve Co., 404 F.2d 1104 (2d Cir. 1968), cert. denied, 396 U.S. 821, 90 S.Ct. 61, 24 L.Ed.2d 72 (1969); Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263 (2d Cir. 1967). Within this framework we proceed to consider appellants' principal contentions.
 
 
 12
 In attacking the district court's decision upholding the Maclaren patent as valid, appellants no not quarrel with Judge Pollack's summary of general principles governing patentability as set forth in the Patent Act of 1952 and some of the leading decisions interpreting it. To be patentable, an invention must be useful, 35 U.S.C. § 101, novel, § 102, and non-obvious, § 103. There can be no dispute that Maclaren's invention, as embodied in a baby stroller, is a useful indeed highly successful creation. However, appellants contend that in two crucial respects the district court departed from or misapplied governing principles, with the result that he upheld as valid a patent that should have been rejected. First, they contend that in defining the scope of Maclaren's claimed invention and the prior art that must be considered in determining whether it was novel and non-obvious, the district court improperly relied upon specifications of the patent to narrow or limit its claims of invention. The effect, appellants argue, was to interpret the claimed invention as one limited to strollers, folding chairs and the like, whereas in fact its claims extend to collapsible support assemblies in general. Appellants contend that although the patent's claims, had they been limited to a stroller that could be collapsed simultaneously by the pressure of one foot and hand, might have been sufficiently novel and non-obvious to be upheld, the actual claims of the patent must be invalidated because they neither mention nor claim this one feature found by the district court to be novel, i. e., substantially simultaneous one-hand folding of the patented structure. Instead, it is argued, they are so broadly drawn as to be anticipated by the prior art and obvious to one possessing ordinary skill in the art of collapsible support assemblies.
 
 
 13
 Secondly, appellants argue that the district court made the mistake, in determining whether the Maclaren patent had been anticipated or rendered obvious by the prior art, of comparing Maclaren's commercial stroller, which is one of the embodiments of his invention, with the prior art rather than following the legally mandated course of comparing the broad claims of his patent with the prior art. Since the patent's claims are broader than claims which might be applicable solely to the stroller, appellants argue that the appropriate and relevant prior art is "collapsible folding structures in general" rather than the more limited scope defined by Judge Pollack, i. e., "stickfolding collapsible support assemblies used for strollers and for seating and carrying purposes in closely related fields." This narrower definition led the district court to eliminate from the pertinent prior art two patents, the Nickles collapsible tent patent (U.S. Pat. No. 1,773,847, issued Aug. 26, 1930) and the Martinson Patent for a collapsible frame for a churn (U.S. Pat. No. 1,250,923, issued Dec. 18, 1917). Appellants argue that these two patents anticipated Maclaren's claims.
 
 
 14
 Since both of these general contentions advanced by appellants, if upheld, could affect our holding on the issue of validity, a closer examination is required. It is a fundamental rule of patent law that the scope of protection granted by a patent is defined by the language of its claims rather than by its title, specifications, exhibits or by the commercial embodiments of the claimed invention. It is the "claims which define the boundaries of a patent monopoly." Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 149, 71 S.Ct. 127, 128, 95 L.Ed. 162 (1950), rehearing denied, 340 U.S. 918, 71 S.Ct. 349, 95 L.Ed. 663 (1951); Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 484-85, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); Milcor Steel Co. v. George A. Fuller Co., 316 U.S. 143, 145-46, 62 S.Ct. 969, 86 L.Ed. 1332 (1942); Permutit Co. v. Graver Corp., 284 U.S. 52, 60, 52 S.Ct. 53, 76 L.Ed. 163 (1931).
 
 
 15
 "Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirement as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' The claims 'measure the invention.' " General Electric Co. v. Wabash Co., 304 U.S. 364, 369, 58 S.Ct. 899, 902, 82 L.Ed. 1402 (1938).
 
 
 16
 This rule does not preclude the court from looking to the specifications and drawings for the purpose of understanding and interpreting the claims of the patent. Indeed, to do otherwise would be to proceed in a vacuum. Neither accuracy nor fairness of decision would be furthered by demanding that a court conceptualize complex patent claims simply in the abstract, without resort to clarifying descriptions. Instead, "(w)hile the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly, . . . it is fundamental that claims are to be construed in light of the specifications and both are to be read with a view to ascertaining the invention." United States v. Adams, 383 U.S. 39, 48-49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966) (citations omitted); Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217, 61 S.Ct. 235, 85 L.Ed. 132 (1940); Shaw v. E. B. & A. C. Whiting Co., supra, 417 F.2d at 1106, n. 11. However, where the claim language is clear, it controls and may not be limited or distorted by resort to specifications, title, or drawings. Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra; Koppers Co., Inc. v. S & S Corrugated Paper Mach. Co., 517 F.2d 1182, 1188 (2d Cir. 1975). "(N)o invention can be saved by features which appear only in the figures, and are not mentioned in the text." Foxboro Co. v. Taylor Instrument Companies, 157 F.2d 226, 232 (2d Cir. 1946), cert. denied, 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684 (1947). Even though a new, useful and non-obvious invention might have been claimed within proper limits, we cannot, once a patent containing overly broad claims is issued, save it from invalidation by in substance re-writing the claims to restrict the patent to the more limited invention that might properly have been claimed. See Bishop & Babcock Co. Mfg. Co. v. Fedders-Quigan Corp., 270 F.2d 102, 106 (2d Cir. 1959). "It is not the responsibility of the courts to remedy deficiencies in patent claims which might have been avoided by a more careful preparation and presentation to the Patent Office." Henry J. Kaiser Co. v. McLouth Steel Corp., 257 F.Supp. 372, 442 (E.D.Mich.1966), affd., 400 F.2d 36 (6th Cir. 1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969). The controlling principle was perhaps best summarized by Judge Learned Hand in Foxboro Co. v. Taylor Instrument Companies, supra, 157 F.2d at 232, where he said:
 
 
 17
 "A patentee who claims broadly must prove broadly; he may not claim broadly, and recede as he later finds that the art unknown to him has limited his invention. That is the chance he must take in making broad claims; . . . ."
 
 
 18
 Applying these principles here, the district court erred in limiting the scope of the prior art to "stickfolding collapsible support assemblies used for strollers and for seating and carrying purposes" and in resolving the novelty and non-obvious issues by comparing Maclaren's commercial stroller, rather than the claims of his patent, to the prior art. The Maclaren patent broadly and unequivocally claims an invention with respect to collapsible support assemblies in general rather than the more limited sphere chosen by Judge Pollack. Although the title, specifications and drawings refer to strollers, folding chairs, shopping carriers and the like as the principal examples of the invention, the claims are not so limited and cannot be labelled as ambiguous. Nor does it appear that the claims were unintentionally broadened. The file wrapper reveals, on the contrary, a deliberate effort to extend the coverage of the patent beyond the specifications and commercial examples. In earlier claims filed by Maclaren he attempted to limit the right of his patent to strollers, folding chairs, "and the like." However, all such qualifications finally were deleted during the prosecution of the patent. Furthermore, during the trial of the present case he advised the district court that he viewed "folding structures in general" as constituting the relevant prior art, 401 F.Supp. at 297. Accordingly, we conclude that while it was proper for the district court to consider, as one factor in gauging the closeness of prior inventions to Maclaren's patent, whether they were adaptable for use as a baby stroller, it was improper to exclude the two earlier patented collapsible support assemblies found in the Nickles and Martinson patents from consideration as relevant prior art.
 
 
 19
 Similarly the district court erred in holding that the Maclaren patent "introduced the novel feature of simultaneous one-hand folding" of the claimed collapsible support assembly. The feature of substantially simultaneous horizontal and vertical folding is unquestionably an important aspect of the commercial Maclaren stroller,[3] which may well have been the principal factor accounting for its financial success. In the words of the district court, "As one presses on the side braces, the bottom of the stroller folds upward as a result of the cooperation, as controlled by the first and second releasable means of the relatively small number of parts required for the Maclaren structure. The end result is greater than one would expect from a combination of each of the individual components in the stroller." 401 F.Supp. at 299.
 
 
 20
 This novel feature of simultaneous folding, however, is nowhere mentioned, much less claimed, in the Maclaren patent. Its claims, while describing in detail the essential features of the collapsible support structure, make no reference, express or implied, to simultaneous folding. Nor do the specifications describe any such feature. Recognizing this problem, Judge Pollack concluded that a claim of simultaneous folding may be inferred as "inherent" from the Figures attached as drawings to the patent and from two paragraphs of the specifications which describe the method of collapsing the structure.[4] However, patentability may not be based on an undisclosed "inherent" feature. Schriber-Schroth Co. v. Cleveland Trust Co., supra, 305 U.S. 47 at 57-60, 59 S.Ct. 8, 83 L.Ed. 34; B. B. Chemical Co. v. Cataract Chemical Co., 122 F.2d 526, 529-30 (2d Cir. 1941). Even though the specifications and drawings might be used for the purposes of construing the claims, there is simply no claim language on the subject of simultaneous folding, ambiguous or otherwise, to be construed. Even if we went further and treated the two paragraphs of the specifications as part of the claims, they would not suggest simultaneous folding. On the contrary, the statement is made that "Continued folding, beyond the condition dotted in FIGURE 2, although possible in theory by continuing to bring the handles 7D, 8D together, is in fact not practicable, so the user assists folding by directly raising the forward end of the structure (or pressing down the handles toward the ground) until the folded condition of FIGURE 3 is reached." (Emphasis added) (E82). This language seems to point to the opposite conclusion, indicating that at least two steps are required to collapse the structure. To discover that it might be simultaneously folded one would have to build the collapsible support assembly described in the patent and test it. Accordingly we must conclude that, despite the patent's broad claims with respect to a collapsible support assembly, it does not include simultaneous folding as part of those claims. Broad as they are, the claims are limited to a collapsible support assembly containing the features described in the patent. We proceed, therefore, to consider whether these claimed features are novel and non-obvious.
 
 Novelty
 
 21
 Although the district court excluded the Nickles patented tent frame from the pertinent prior art, it went on to find that Nickles, while disclosing some common elements (e. g., a "second releasable means"), was based on differences in structural design and therefore did not anticipate Maclaren. While the record affords room for conflicting inferences, we do not think that we can fault the trial court's conclusion.
 
 
 22
 Maclaren's Claim 1 calls for a "collapsible support assembly comprising a bottom cross frame of interpivoted rigid members, (and) a back cross frame of interpivoted rigid members. . . . " (emphasis supplied). Although the Nickles tent discloses a collapsible assembly consisting of cross frames, they do not form the bottom and back of the mechanism as do Maclaren's two X-frames. Instead, Nickles' cross frames are placed in the shape of an inverted V, with the wide mouth of the V connected to two side braces that run along the ground. While Maclaren's side braces are knuckle-jointed and held open by a "second releasable means" that enables the braces to act as compression members, the Nickles side braces must rely upon the ground to hold them in the extended position. Appellants argue that Nickles utilizes cords instead of toggle bars and pivot joints to keep the tent extended in the manner of Maclaren's claimed first and second releasable means. However, the district court concluded that the ropes cannot prevent an upward break in the side braces when the tent is lifted off the ground and therefore cannot be adapted to other uses such as strollers. 401 F.Supp. at 298. This conclusion finds substantial support in the record.[5] Although Maclaren and Nickles each disclose a collapsible support assembly, the former performs a function that cannot be performed by the latter.
 
 
 23
 The second prior patent relied upon by appellant to discredit the novelty of Maclaren's invention is Martinson's collapsible churn frame which the district court, although excluding it from relevant prior art, nevertheless considered. Like Maclaren's, the Martinson patent reveals cross frames attached to side braces. But the district court concluded that Martinson differs from Maclaren in material respects that would render the invention unsuitable for use in a stroller or similar devices. See 401 F.Supp. at 298. In particular, like Nickles' tent and unlike Maclaren's design, Martinson's cross frames do not form the back and bottom of the invention but instead are side frames. In addition, the cross members of the Martinson frame are neither interpivoted nor absolutely rigid as found in Maclaren's claim language. While the respective experts of the parties dispute these factual differences,[6] we find no error in the district court's conclusion that Martinson did not anticipate Maclaren. It cannot fairly be said that there was identical disclosure of Maclaren's invention in the prior relevant art.
 
 Non-Obviousness
 
 24
 A patent that is both novel and useful may nevertheless be invalid if the features contained in the claims would have been obvious to a person of ordinary skill in the prior relevant art, 35 U.S.C. § 103. Therefore, even though a claim satisfies the novelty requirements of § 102 and is not anticipated by a prior patent, the totality of earlier art may demonstrate that the invention lacks the degree of non-obviousness necessary to justify rewarding the inventor with the fruits of an economic monopoly. In determining whether the new development was non-obvious we must, of course, be careful to resist the temptation of simply filtering the new invention through the lens of hindsight. Since "(s)ubstantially all inventions are for the combinations of old elements," Safety Car Heating & Lighting Co. v. General Electric Co., 155 F.2d 937, 939 (2d Cir. 1946) (L. Hand, C. J.), "the corrosive effect" of time can easily lead a court to succumb to the tendency of regarding virtually any improvement as "obvious" in light of the modern, updated art. Lemelson v. Topper Co., supra, 450 F.2d at 848. Nevertheless, because the social costs of a patent monopoly can be great, courts have not been lax in closely scrutinizing the "non-obviousness" of a claimed invention and disregarding patents that follow too closely in the wake of their predecessors. See, e. g., Sakraida v. Ag Pro, Inc., supra; Julie Research Laboratories Inc. v. Guildline Inst. Inc., supra; Supreme Equipment & Systems Corp. v. Lear Siegler Inc., 495 F.2d 860 (2d Cir. 1974); Lemelson v. Topper, supra; Formal Fashions Inc. v. Braiman Bows Inc., 369 F.2d 536 (2d Cir. 1966); Lorenz v. F. W. Woolworth Co., 305 F.2d 102 (2d Cir. 1962). In short, § 103 mandates a "rather rigorous standard" in judging whether the claimed new invention was non-obvious. Lemelson v. Topper, supra, 450 F.2d at 848.
 
 
 25
 As correctly noted by the district court, see 401 F.Supp. at 296, the Supreme Court has delineated three areas to be determined and considered in evaluating the obviousness of patented work: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the art. Graham v. John Deere Co., supra, 383 U.S. at 17, 86 S.Ct. 684. In addition, a court legitimately may consider such matters as the commercial success of the claimed invention and its satisfaction of long-felt needs, although such criteria are of distinctly secondary importance. See Julie Research Laboratories Inc. v. Guideline Inst. Inc., supra, 501 F.2d at 1135; Formal Fashions Inc. v. Braiman Bows Inc., supra, 369 F.2d at 539. An examination of undisputed facts with respect to each of the three factors outlined in Graham leads us to the conclusion that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.
 
 
 26
 As noted previously, because Maclaren broadened his claim language beyond application to strollers and collapsible chairs, his invention properly is subject to comparison with the broad range of prior art which relates to collapsible support assemblies in general. A short description of two of the patents falling within the ambit of the prior art, Nickles and Martinson, was provided earlier. In addition to these two patents, relevant collapsible assemblies are found in two more patents: (1) the Turner patent for a collapsible frame to hold work on a sewing machine (U.S. Pat. No. 146,110, issued Dec. 20, 1893), and (2) the Shibazaki baby stroller (Japan Pat. No. 24,216, issued Mar. 18, 1926).
 
 
 27
 Turner's frame for holding work on sewing machines, like Maclaren's collapsible supporting structure, provides supporting back and bottom cross frames of "interpivoted rigid members" and two foldable side braces. The cross frames are held in the extended position by two clamps that pin the frames to the supporting structure. The clamps, like Maclaren's toggle bar, constitute a "first releasable means to hold the members of at least one of the cross frames in an extended position when the assembly is unfolded" as required in Maclaren's patent. Turner's design, however, lacks a similar "second releasable means" to hold the side braces in an extended position. The Shibazaki stroller similarly contains supporting back and bottom cross frames connected to two side braces by slides rather than pivot joints. The cross frames are kept in the extended position by toggle bars as in Maclaren's patent, but the side braces are not foldable and therefore do not disclose a "second releasable means."
 
 
 28
 A comparison of the prior art, as revealed in the four earlier patents, with the claims at issue demonstrates that while none of the earlier patents combines all of Maclaren's features, each feature was foreshadowed in at least two of these predecessor collapsible assemblies. For example, the use of interpivoted rigid members can be found in Nickles', Turner's, and Shibazaki's cross frames.[7] The back-bottom orientation of the cross frames is evidenced in both Turner's and Shibazaki's design.[8] The interpivotal attachment of one cross frame to the other in order to permit "the members of each cross frame to pivot with respect to each other and to permit said cross frames to pivot with respect to each other" (that is, to allow each cross frame to widen and narrow and to rotate with respect to the other) is provided by Martinson,[9] Turner,[10] and Shibazaki.[11] Nickles, Martinson, and Turner all exhibit "two foldable brace members"[12] and all three pivot the braces to the two cross frames.[13] A "first releasable means to hold the members of at least one of the cross frames in an extended position when the assembly is unfolded" is adopted by Martinson,[14] Turner,[15] and Shibazaki.[16] Finally, the "second releasable means to hold said brace members in an extended position" is provided by Nickles[17] and Martinson.[18]
 
 
 29
 The fact that when these earlier collapsible support mechanisms are considered as a group they disclose all of the elements of Maclaren's claims would not necessarily prove fatal to his patent. As the district court correctly recognized, although the prior art was extensive, "no single item of prior art shows the complete combination." 401 F.Supp. at 299. Judge Pollack further noted correctly that we have long recognized the validity of combination patents even when the individual elements are already firmly rooted in the relevant art. See, e. g., Ling-Temco-Vought Inc. v. Kollsman Instrument Corp., supra, 372 F.2d at 268; Safety Car Heating & Lighting Co. v. General Electric Co., supra, 155 F.2d at 939; B. G. Corp. v. Walter Kidde & Co., 79 F.2d 20, 22 (2d Cir. 1935). Finally, the court properly concluded that "(t)o invalidate the claim it must be shown that the combination was obvious, not merely its components." 401 F.Supp. at 299. However, the court erred in its application of these principles to the facts of this case. The error appears to have stemmed from the mistaken views, already noted by us, that the Maclaren patent claimed the novel feature of simultaneous folding and that a comparison for the purpose of determining non-obviousness could be limited to Maclaren's commercially successful stroller instead of the broader collapsible support assembly claimed by him.
 
 
 30
 Although none of the prior art patents, standing alone, discloses all of the features broadly claimed by Maclaren, Turner's foldable frame contains all of the features except a second releasable means to hold the side braces extended. It reveals the two cross frames, back-bottom orientation of these frames, a first collapsible release mechanism, and two foldable side braces, all of which are connected in a fashion that enables the structure to be collapsed in substantially the same fashion as the collapsible assembly claimed by Maclaren. When extended, the frame, like the Maclaren assembly functions as a support mechanism. The Turner assembly, like Maclaren, is collapsed by initially loosening a first release mechanism (the clamps which are the counterpart of Maclaren's toggle bar), then pushing each of two cross frames together (just as Maclaren's two cross frames are collapsed by pushing the two handles 7R and 8D together) and then folding the two collapsed Turner cross-frames toward one another by collapsing the two braces separating them. The result is a single structure folded into the form of a stick assembly. Although Turner does not suggest that his assembly might be adapted for use as a stroller, the Shibazaki patent, which similarly discloses cross frames, back-bottom orientation of these frames, interpivotal attachment of one cross frame to the other, and a first releasable means to hold at least one of the cross frames in an extended position, clearly demonstrates this possible use.
 
 
 31
 The essential question is whether the addition by Maclaren of a "second releasable means" to this previously disclosed combination of elements for the purpose of holding the side braces in extension would have been obvious to a person skilled in the art of collapsible mechanisms. On the undisputed facts we must conclude that it would have been. Turner's patent expressly noted the utility of including "any other suitable means" for holding the side braces in the open position, and Maclaren's, own expert all but acknowledged that "it would be obvious" to modify Turner's side braces by introducing a knuckle joint or similar means in order "to prevent outward folds" in the brace elements.[19]
 
 
 32
 Thus, if Maclaren had had the Turner and Shibazaki patents before him when he invented his collapsible support assembly, which we must assume for present purposes, Application of Winslow, 365 F.2d 1017, 1020, 53 C.C.P.A. 1574 (1966), it would have been obvious to create a combination that joins Turner's foldable braces with a "second releasable means to hold said brace members in an extended position when the assembly is unfolded" as specified in Claim 1 of Maclaren's patent. The patent must, therefore, be invalidated under § 103 unless, as a last resort, it could be seriously contended that Maclaren's choice of the particular type of second releasable means shown in his patent somehow offers a non-obvious improvement over the prior art. We find no support for such a contention. The district court found "that the second releasable means consists of the knuckle joints plus either the seat struts or the wheel struts or both." 401 F.Supp. at 299 n. 12. Nothing here would have been non-obvious to a skilled inventor. Martinson's prior patent, for example, utilized a knuckle joint to hold its brace elements extended. Others have employed a knuckle joint and strut combination.[20] Indeed, as the district court noted in another passage that is confirmed by the work of Nickles, Martinson, Turner and Shibazaki, "the prior art discloses the use of cross frames, pivot joints, toggle bars, foldable side braces, knuckle joints, and struts in folding structures." 401 F.Supp. at 299. Therefore, while Maclaren's invention embodied in a stroller undoubtedly produced a practical and commercially popular mechanism, we conclude that the claimed elements of his patent either in their conception as a combination or in their implementing components do not represent a non-obvious improvement over the prior art.
 
 
 33
 Since the patent must fall under 35 U.S.C. § 103, there is no need to consider the merits of defendant's "late-claiming" defense.
 
 
 34
 Reversed.
 
 APPENDIX
 
 35
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 In 1972 B-I-W was merged into Cross River Products Inc. Both entities will be referred to as B-I-W in this opinion
 
 
 [2]
 Plaintiffs introduced the testimony of Don A. Fischer, a consulting engineer and former university dean of electrical and industrial engineering and Lew W. Throssel, a trade expert. Defendants relied upon James B. Gambrell, a professor of patent law, and Ferdinand Freudenstein, a professor of mechanical engineering
 
 
 [3]
 In actual practice, it seems that the Maclaren stroller is most easily collapsed by use of both hand and foot: foot to break the toggle bar; hand to fold the structure up
 
 
 [4]
 The two paragraphs (E 82, column 4, 11. 6-19) read as follows:
 "To fold the structure from the condition of Figure 1 to that of Figure 3 (as is seen by the dotted lines in Figure 2) the user 'breaks' the toggle 9A, 9B, upwards and urges the handles 7D, 8D together. This collapses the X-frames and this action is accompanied by 'breaking' of the braces (about pivots 7B, 8B) so that corners 1A, 2A rise toward the upward folded, position.
 "Continued folding beyond the condition dotted in Figure 2, although possible in theory by continuing to bring the handles 7D, 8D together, is in fact not practicable, so the user assists folding by directly raising the forward end of the structure (or pressing down the handles toward the ground) until the folded condition of Figure 3 is reached."
 
 
 [5]
 Maclaren's expert contended that "(t)here is no first or second releasable means for the bars 12-12 would collapse if the tent were laid on its side to make some sort of seat." 65A. Similarly, on cross-examination plaintiff's expert reiterated that if the tent were lifted off the ground, the side braces would fold regardless of Nickles' use of rope. 485A. Defendant's expert disagreed, 141A, but the district court was entitled to resolve the factual dispute in plaintiff's favor
 
 
 [6]
 Compare defendant's expert testimony at 147A with plaintiff's at 492A-493A
 
 
 [7]
 While Shibazaki's cross frames use both parallel and cross bars, they still qualify as "cross frames" as contained in Maclaren's claim language and the district court apparently so found, see 401 F.Supp. at 298. On the other hand, the district court concluded that Martinson employed neither interpivoted nor rigid cross frames. Id. The record can support this conclusion. See 493A
 
 
 [8]
 Nickles' cross frames are oriented to form a V-shape adaptable to use as a tent. Martinson uses side cross frames
 
 
 [9]
 Martinson's cross frames are pivoted by joining their members to four side bars that in turn are pivoted together toward the top
 
 
 [10]
 Turner, unlike Maclaren, relies upon hinges to attach the cross frames to each other in order to secure the desired movement. But the hinges serve to pivot the two cross frames precisely as required in Maclaren's claim
 
 
 [11]
 Shibazaki's cross frames, however, would appear to have a less complex rotation movement than Maclaren's. In contrast, the drawings and language of Nickles' patent do not help us to clarify whether the movements of its cross frames duplicate Maclaren
 
 
 [12]
 Shibazaki's braces are rigid
 
 
 [13]
 Turner's cross frames and brace members are connected by hinge bars. But the hinge bars, which act as a pivot, comply with the language of Maclaren's Claim 1. See note 10 supra
 
 
 [14]
 Like Maclaren, Martinson uses a bar to hold the cross frames extended. While Maclaren's bar is released by breaking a knuckle joint at the center of the bar, Martinson's bar is released by detaching it from the left end of the side bar
 
 
 [15]
 Turner relies upon clamps to lock the cross frames in the extended position. Maclaren earlier had recognized that such locks can perform the function of a first releasable means. E117. The district court, however, apparently distinguished the clamps from Maclaren's first releasable means by noting that the clamps are not "organic" to the structure. 401 F.Supp. at 298. This distinction finds no support in the language of Maclaren's Claim 1
 
 
 [16]
 Shibazaki relies upon toggle bars to hold the cross frames extended just as does Maclaren
 It is arguable that the extended rope found in Nickles' invention also qualifies as a first releasable means, but it is unclear how a cord would perform the same extension function as a bar locked in place with a knuckle joint.
 
 
 [17]
 The district court found that Nickles' "foldable brace running along the ground and connecting the two sides" qualifies as a "second releasable means" although he noted that it would be of little utility to a stroller and that "there is no structure which prevents an upward break in the brace." 401 F.Supp. at 298
 
 
 [18]
 Martinson used a knuckle joint to hold the side braces extended. The district court found that the "foldable side braces connecting the two cross frames is kept extended (in Martinson), insofar as preventing it from breaking downward is concerned, by a knuckle joint." 401 F.Supp. at 298
 
 
 [19]
 "Q: What I ask you is this: Are the Turner side braces which are shown by the color blue capable of folding inwardly and outwardly?
 "A: Yes.
 "Q: And could you attach a knuckle joint in each of those side braces to prevent outward folds?
 "A: You could.
 "Q: Would it be obvious to do so if you wanted to prevent outward folds of the side braces in Turner?
 "A: Well, it would be obvious to do so, yes, if you wanted to prevent outward folds of the side braces, but there is no interconnection to the rest of the apparatus.
 "Q: I am talking about putting knuckle joints right in the center of the side braces at the points where they fold. Would it be obvious to do that if I wanted to prevent outward folds of the side braces?
 "A: Yes."
 463A-464A.
 
 
 [20]
 In fact, another invention drawn from the prior art, Hurvitz's stroller (U.S. Pat. No. 3,094,339, issued June 18, 1963), contains a knuckle joint seat strut design that is essentially identical to Maclaren's. The district court specifically noted that Hurvitz "disclose(s) a foldable side brace with a knuckle joint and seat strut. . . . " 401 F.Supp. at 299. He went on to disregard Hurvitz's patent since it is "not in the context of a stickfolding stroller with a relatively small number of specially cooperating parts." Id. As noted earlier, this definition of the art is too narrow. And Hurvitz's invention aptly demonstrates that Maclaren cannot hope to predicate patentability on his choice of second releasable means since his use of a knuckle joint and seat strut probably cannot qualify as a novel, let along a non-obvious, improvement over the art