**LOUIS MARX & CO., INC., Plaintiff,**

v.

**BUDDY L CORPORATION, Defendant.**

**No. 76 Civil 3703.**

United States District Court,
S. D. New York.

May 30, 1978.

---

Blum, Moscovitz, Friedman & Kaplan, New York City, for plaintiff; Harold I. Kaplan, James K. Silberman, Michael I. Wolfson, New York City, of counsel.

Hopgood, Calimafde, Kalil, Blaustein & Lieberman, New York City, for defendant; John M. Calimafde, Marvin N. Gordon, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff Louis Marx & Co. ("Marx") and defendant Buddy L Corporation ("Buddy L") are in the business of importing and selling toy typewriters. At the time in question both purchased their stock from a single Japanese manufacturer. Plaintiff sold the "Marxwriter" and defendant sold the Buddy L "Easy Writer" which are substantially similar in appearance and working parts. Marx, alleging infringement of one claim in each of two patents it owns and unfair competition, brought suit against Buddy L.[1] At the close of a four-day trial, the Court granted defendant's motion to dismiss one of the patent claims[2] and the unfair competition claim.[3] Although in its post-trial submission plaintiff seeks to reargue these matters, the Court is convinced that upon the facts and the law the proper disposition was made at that

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1338.

[2] The Court held that a typewriter embodying the claimed invention was on public sale and in fact was sold more than one year prior to the patent application date, thus sustaining defendant's defense under 35 U.S.C. § 102(b); *Timely Prods. Corp. v. Arron,* 523 F.2d 288, 299, 302 (2d Cir. 1975). Defendant asserted additional defenses, some of which are discussed herein in connection with defendant's application for an award of attorneys' fees. *See* Part II, *infra.*

[3] Plaintiff charged that Buddy L knew that the Japanese manufacturer used plaintiff's *tools* and dies in producing defendant's goods, and that Buddy L's purchase of these goods from the manufacturer constituted unfair competition. The Court found that Buddy L had neither knowledge nor reason to know that this was so. Rather, the Court accepted "the testimony of [Buddy L's president] that he acted in good faith, that he relied upon the representations made to him [that no goods made for Buddy L used Marx-owned tools, dies and molds but rather were made on separate and different tools, dies and molds] by the [manufacturer's] representative in Japan, and further, when an issue was raised, he renewed the request with respect to what the status of the matter was, and again the representations were made." Transcript ("Tr.") p. 633.

time.[4] With those claims dismissed on the merits, there remains but one claim of patent infringement to be decided.

## I

Marx owns patent number 3,338,369, which was issued to one W. E. Rexford, a former Marx employee, on August 29, 1967 (the "Rexford Patent"). Claim 15, which is allegedly infringed by Buddy L's Easy Writer, provides:

15. In a typewriter of the class described, the combination including a frame, a plurality of keys moveably mounted in said frame, a plurality of type bar levers pivoted to said frame, one key being provided for each of said type bar levers, an escapement mechanism, a universal bar operatively connected to said escapement mechanism, and a plurality of key levers, each of said key levers including a key arm, a universal arm, a type bar arm and pivot means for pivotally supporting said key lever on said frame, said key lever arms intersecting and being coplanar at the intersection thereof and being substantially coplanar at points remote from said intersection, the outer end of said key arm cooperating with an associated one of said keys for actuation of said key lever, the outer end of said type bar arm cooperating with an associated one of said type bar levers for actuating same, and the outer end of said universal arm cooperating with said universal bar for actuation of said universal bar.

The claim is illustrated in the figures shown on following page.

---

4. Plaintiff's primary challenge to the Court's earlier disposition is on the unfair competition claim. *See* note 3 *supra.* Post trial, plaintiff became "aware of several court decisions," changed its theory and argued that Buddy L had appropriated Marx's trade secrets and was liable therefor for unjust enrichment whether or not it had knowledge, relying primarily upon *Conmar Prods. Corp. v. Universal Slide Fastener,* 172 F.2d 150 (2d Cir. 1949), and *Koehring Co. v. National Automatic Tool Co.,* 257 F.Supp. 282 (S.D.Ind.1966), *aff'd,* 385 F.2d 414 (7th Cir. 1967) (per curiam), both cases involving trade secrets. Aside from plaintiff's total failure to introduce any evidence whatsoever concerning the existence of any trade secrets in connection with the Marxwriter parts, neither case supports the plaintiff's position. *Koehring* was decided under Indiana law and involved that defendant's hiring of plaintiff's former employees. In *Conmar,* concerning a fact situation similar to that in *Koehring,* the Court permitted recovery only for the defendant's use of plaintiff's trade secrets for the period after he learned of the employee's breach of the secrecy agreement with plaintiff. Thus, even in *Conmar,* knowledge is essential, and as indicated in note 3 *supra,* plaintiff did not prove knowledge. Finally, any recovery under a *Conmar* theory would be cut off as of the time that plaintiff offered the product embodying the trade secret for public sale. *See Timely Prods. Corp. v. Arron,* 523 F.2d 288, 304 (2d Cir. 1975); *Conmar, supra,* 172 F.2d at 155–56.

FIG. 4

FIG. 5

In simple language, the claim describes a flat piece consisting of three intersecting arms lying in a common plane and is shaped somewhat like the letter "y" lying on its side. Each of the three extensions from the center point, the point of intersection, is connected to a different part of the typewriter: one arm, indicated as number 41 in the above figures is connected to the key mechanism which the operator physically presses (the "key arm"); a second arm, indicated as 43, is attached to the universal spacing mechanism (the "universal arm"); and the third arm, numbered 44, is connected to the type bar itself by means of a wire link (the "type arm"). By incorporating these three functions in one element, the typewriter is able to transmit the force of the operator pressing a key to the type bar itself to print the desired letter and, at the

same time, to advance the carriage so that the machine is in position to receive the next letter. The advantage ascribed to the claim is threefold: first, by making the "y" flat, only three dies, one for each row of keys, are necessary to produce all of the pieces; second, they may be made from plastic, rather than using the more expensive metal; and third, they are thus able to be installed in parallel fashion. The wire link between each of these parallel type arms and the actual type bars, in connection with a curvature in the arrangement of the type bars, causes whichever key is hit, no matter where on the keyboard, to activate the type bar and make an imprint in roughly the same place to form an even line of type.

Both the Marxwriter and the Buddy L machine have mechanisms which largely incorporate elements of the Rexford claim. Indeed, the only difference between the patent claim and the two typewriters appears to be that in these two typewriters the key is actually secured to the key arm in an open keyboard, while the patent describes a "plurality of keys moveably mounted in [a] frame," i. e., the key itself merely rests upon the key arm and is free to float up and down through a tubular channel in a closed keyboard frame. Although defendant urges that this distinction is sufficient to support a finding of noninfringement in light of the literal language of the claim,[5] it is unnecessary to resolve this issue if its claim of invalidity is sustained.

Buddy L's primary attack on the Rexford patent is that it was "obvious at the time the invention was made to a person having ordinary skill in the art,"[6] and hence was unpatentable. In determining the question of obviousness, the Supreme Court held in the landmark case of *Graham v. John Deere Co.*:[7]

the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

The test is not the substantiality of the differences between the claimed device and the prior art, but the obviousness of the invention as a whole.[8] Pertinent prior art includes those "arts the patentee could reasonably be expected to consult in doing the inventing."[9] Moreover, as this patent admittedly is a combination patent—i. e., an assemblage of known parts—a "rather rigorous standard" of nonobviousness must be applied.[10] In short, the question is whether

5. See *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 149, 71 S.Ct. 127, 95 L.Ed. 162 (1950); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Universal Oil Prods. Co. v. Globe Oil & Ref. Co.*, 322 U.S. 471, 484–85, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); *MacLaren v. B–I–W Group, Inc.*, 535 F.2d 1367, 1372 (2d Cir. 1976).

6. 35 U.S.C. § 103.

7. 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966); *accord, Formal Fashions, Inc. v. Braiman Bows, Inc.*, 369 F.2d 536, 538 (2d Cir. 1966).

8. *Timely Prods. Corp. v. Arron*, 523 F.2d 288, 293 (2d Cir. 1975); *In re Buehler*, 515 F.2d 1134 (C.C.P.A.1975).

9. *Digitronics Corp. v. New York Racing Ass'n*, 553 F.2d 740, 745 (2d Cir. 1977). Plaintiff argues that the pertinent prior art should be limited to toy typewriters. Aside from the fact that one would expect an inventor of a toy typewriter to consult a larger portable or office machine even if changes would be necessary to account for the difference in sophistication of the intended customer, the prior art cited by the Patent Office during the prosecution of this patent included machines other than juvenile typewriters and plaintiff raised no objection at that time.

10. *MacLaren v. B–I–W Group, Inc.*, 535 F.2d 1367, 1376 (2d Cir. 1976); *see, e. g., Sakraida v. Ag Pro Inc.*, 425 U.S. 273, 281, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Anderson's Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969) (requiring a

the Rexford claim would have been "obvious to a hypothetical mechanic who, among other things, has the prior art in mind when he endeavor[ed] to solve the problem for which the patent is obtained."[11] Plaintiff cautions that in making this determination, the Court must avoid slipping into hindsight and "resist the temptation to read into the prior art the teachings of the invention in issue."[12] Plaintiff also, of course, relies upon the patent's presumed validity.

■ Having been duly issued by the Patent Office, the Rexford patent carries the statutory presumption of validity.[13] However, that presumption has been attenuated in recent years for a variety of reasons as expressed by the courts.[14] The presumption is further weakened where significant prior art was not considered by the Patent Office.[15] Plaintiff's counsel acknowledged that "the most pertinent prior art uncovered,"[16] the "Burridge patent," was not considered when the Patent Office examined and then granted the Rexford patent.

Patent number 1,060,582 was issued to one L. S. Burridge in 1913 upon an application dating back to 1901. Plaintiff's expert witness, Mr. J. E. Thomson, agreed that "Burridge discloses a three-armed key lever wherein the arms respectively are joined to the key, to the universal bar, and to the type lever through a linkage," and perform virtually the same functions as do the corresponding parts in the Rexford machine.[17] Indeed, plaintiff's expert conceded that virtually the sole difference between the Burridge three-armed lever and the Rexford is that, while both are "coplanar at the point of intersection" as described in Rexford claim 15, the three arms in Burridge are not "substantially coplanar at points remote from said intersection."[18] This is because in Burridge, the type arm bends toward the center of the machine at a certain point so as to permit proper placement of the type bar striking the platen. As that bend is in one of the lever arms, it is necessary in Burridge to use a separate mold for each lever as each is bent at a somewhat different angle. But for that bend in the type arm, however, Thomson agreed that Burridge was a direct anticipation of Rexford.[19] As stated above, to achieve the same result as Burridge's bend—i. e., proper placement of the type bar on the platen—the Rexford design connects the actual type bar to the type arm with a wire link and thus causes the key to strike the platen in the same place each time.

The Rexford patent was not the first to disclose use of a wire link to connect a lever with the actual type bar. Indeed, as the prior art that was considered by the Patent

"synergistic result"); *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.,* 340 U.S. 147, 152–53, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950) (courts should scrutinize combination patents with great care; necessary to show that "the whole in some way exceeds the sum of its parts"); *Lemelson v. Topper Corp.,* 450 F.2d 845, 848 (2d Cir. 1971).

11.  *Formal Fashions, Inc. v. Braiman Bows, Inc.,* 369 F.2d 536, 538 (2d Cir. 1966).

12.  *Timely Prods. Corp. v. Arron,* 523 F.2d 288, 294 (2d Cir. 1975) *quoting Graham v. John Deere Co.,* 383 U.S. 1, 35, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

13.  35 U.S.C. § 282.

14.  *See, e.g., Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.,* 340 U.S. 147, 154, 155, 71 S.Ct. 127, 95 L.Ed. 162 (1950) (Douglas, J., concurring) (Patent Office greatly expanding its own jurisdiction); *Kahn v. Dynamics Corp. of America,* 508 F.2d 939, 942 (2d Cir. 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975) (Patent Office misled as to true import of prior art references); *MacLaren v. B–I–W Group, Inc.,* 401 F.Supp. 283, 297 n.11 (S.D.N.Y.1975), *rev'd on other grounds,* 535 F.2d 1367 (2d Cir. 1976) (Patent Office is too overworked to give adequate attention to patent applications and grants).

15.  *Julie Research Labs. Inc. v. Guideline Instruments, Inc.,* 501 F.2d 1131, 1136 (2d Cir. 1974); *Lemelson v. Topper Corp.,* 450 F.2d 845, 849 (2d Cir. 1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1253, 31 L.Ed.2d 456 (1972); *Formal Fashions, Inc. v. Braiman Bows, Inc.,* 369 F.2d 536, 539 (2d Cir. 1966).

16.  Tr. 623.

17.  Tr. 209–10.

18.  Tr. 258–59.

19.  Tr. 260.

Office reveals, Rexford himself used a wire link in a design for a general portable typewriter in a 1963 application. So, too, Thomson, plaintiff's expert and the holder of seven patents in the juvenile typewriter field, used the wire link from a flat lever, which like Rexford's lay in parallel relationship with the other levers, to the type bar, in 1962.

▓ Thus, at the time of the Rexford invention, the prior art taught the use of: (a) a three-armed lever coplanar at the point of intersection and coplanar to some point remote from the point of intersection, at which point one of the arms bent towards the center; and (b) a wire link from a lever which was entirely coplanar (i. e., flat) to the type bar itself. To achieve the advantage of Burridge—i. e., use of the three-armed lever—without the need to make a separate mold for each arm to accommodate the bend, all one would have to do would be to replace the bend with the wire link first taught by the Thomson patent in 1962. This substitution would have been obvious for any skilled worker to make in 1965, including the "hypothetical mechanic" through whose eyes the Court evaluates this question.[20] Claim 15 of the Rexford patent is invalid and plaintiff's complaint is dismissed in its entirety upon the merits.

## II

▓ Defendant, having successfully withstood all of plaintiff's claims, moves for an allowance of attorneys' fees pursuant to 35 U.S.C., section 285, which provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." As noted by our Court of Appeals, this relief is "not usually granted" and the statute's language makes clear "that Congress intended the trial court to exercise its sound discretion in deciding whether a case was sufficiently exceptional to vitiate the normal rule that each party bear his own attorneys' fees."[21] Thus, the rule in this circuit is that " 'only where the court is convinced that the patent in suit is so wholly devoid of substance that the plaintiff could not have had a bona fide belief in its validity shall it award the defendant reasonable attorneys' fees pursuant' to the statute."[22] This requirement is met, for example, in cases where there was fraud or deception in prosecution of the patent sued upon.[23]

Defendant argues that plaintiff's patent claims, both under the Rexford patent and the patent invalidated at the close of trial, number 3,724,632, the "Kuramochi patent," were so obviously devoid of substance as to warrant a fee award in the Court's discretion. With respect to the former, Buddy L argues that Rexford was so clearly obvious in light of Burridge that Marx could not have had a bona fide belief ·in its validity. With respect to the latter, which was invalidated pursuant to a finding that the claimed invention was on public sale more than one year prior to the patent's application date,[24] defendant's argument is threefold: (a) Marx knew the device covered by the Kuramochi patent had been exhibited for sale more than one year prior to the

---

20. *See* text accompanying note 11 *supra.* Moreover, as this is not at all a "close case," it is unnecessary to consider the "secondary considerations" on the issue of obviousness, e. g., long felt need, immediate copying and commercial success. *See Sakraida v. Ag Pro Inc.,* 425 U.S. 273, 282–83, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Digitronics Corp. v. New York Racing Ass'n,* 553 F.2d 740, 748 (2d Cir. 1977); *Timely Prods. Corp. v. Arron,* 523 F.2d 288, 295 (2d Cir. 1975).

21. *Kahn v. General Dynamics Corp.,* 508 F.2d 939, 945 (2d Cir. 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975).

22. *Id.* at 944, *quoting Indiana Gen'l Corp. v. Krystinel Corp.,* 297 F.Supp. 427, 449 (S.D.N.Y. 1969), *aff'd,* 421 F.2d 1023 (2d Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970); *see Bussemer v. Artwire Creations, Inc.,* 231 F.Supp. 798, 805 (S.D.N.Y.1964).

23. *See, e. g., Timely Prods. Corp. v. Arron,* 523 F.2d 288, 305 (2d Cir. 1975); *Kramer v. Duralite Co.,* 514 F.2d 1076 (2d Cir.) (per curiam), *cert. denied,* 423 U.S. 927, 96 S.Ct. 275, 46 L.Ed.2d 255 (1975); *Kahn v. General Dynamics Corp.,* 508 F.2d 939, 945 (2d Cir. 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975).

24. *See* note 2 *supra.*

application date; (b) Marx knew that its assignor had defrauded the Patent Office by knowingly and incorrectly claiming to be the inventor of the Kuramochi patent; and (c) the Buddy L Easy Writer obviously does not infringe upon the Kuramochi patent. Defendant urges that these factors, alone or in combination, make out an "exceptional case" and entitle it to fees.

Of course, the fact that defendant prevailed is an insufficient predicate for a fee award under the statute. True, the Burridge patent is the key to the Court's finding of obviousness and hence invalidity in Rexford. Yet, for example, had the Court narrowly limited the scope of pertinent prior art to the category of juvenile typewriters, as urged by plaintiff,[25] Burridge would not have even been considered. Although the claim was held invalid for reason of obviousness, the Court is not persuaded that plaintiff did not have a bona fide belief in its validity.[26] Moreover, plaintiff was justified in relying upon the presumption of validity of the patent, whatever shortcomings may be charged to the Patent Office in its issuance in the light of the prior art.

With respect to the Kuramochi patent, defendant's application for fees in two respects concerns knowledge allegedly had by plaintiff. First, defendant argues that since the Court invalidated the claim because of prior sale, Marx, as a corporate organization, must have known this fact internally and its instituting and prosecuting this suit could only have been in bad faith.[27] However, the Court made this finding only by resolving a sharp conflict in testimony in Buddy L's favor. Plaintiff's employee testified that what was offered for sale at the annual toy exhibition was an inoperable frame model with no working parts; that the device claimed by the Kuramochi patent was missing. Although the Court rejected this testimony in favor of that of defendant's witness, a former Marx distributor who said that he would never have placed his order unless he had been shown a working model, there is no reason to believe that plaintiff acted in bad faith in prosecuting its claim and resisting the defense of prior sale. Marx's witness presumably gave his employer the same information to which he testified in court. Further, as explained by plaintiff's president at the start of trial, the present owners of Marx purchased the company after the events in question and have had great difficulty in obtaining much of the documentation relating to the prior owners' period of control.

With respect to the other item allegedly known by Marx prior to trial, Buddy L brought a witness to trial from Japan who testified that he was the actual inventor of the claimed device, rather than plaintiff's assignor, Kuramochi.[28] Although this, too, would invalidate the patent, defendant's attorney represented that the witness' testimony was offered "primarily on the issue of attorney's fees." Defend-

25. See note 9 supra.

26. See Indiana Gen'l Corp. v. Krystinel Corp., 297 F.Supp. 427, 449 (S.D.N.Y.1969), aff'd, 421 F.2d 1023 (2d Cir.), cert. denied, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970).

27. See Merry Hull & Co. v. Hi-Line Co., 243 F.Supp. 45, 57 (S.D.N.Y.1965).

28. When defendant called this witness, plaintiff objected on the grounds that another Japanese citizen had been originally listed by defendant in the pretrial order as being the actual inventor and the scheduled witness in connection with this defense, and that plaintiff learned of the substitution only one week prior to trial. Plaintiff moved to strike this testimony and the Court reserved decision.

The motion is denied. As indicated below, this testimony is offered primarily for and considered only in connection with the attorney fees application. Moreover, despite plaintiff's claim of surprise, it is clear that plaintiff suffered no prejudice. Plaintiff had not taken the deposition of the originally scheduled witness, nor did plaintiff seek at any time to depose the witness who appeared after being notified of the substitution. Plaintiff's contention in response to this defense was that after investigation, it was "satisfied that [plaintiff's assignor] was the first and true inventor," Tr. 465, a contention which would be appropriate regardless of who defendant argued was the actual inventor.

ant's attorney also conceded, however, that there was no proof that Marx had knowledge or reason to suspect that its assignor was not the true inventor, but asked that the Court draw this inference from Marx's failure to call Kuramochi at trial. While this Court questioned the failure of plaintiff to call Kuramochi, from whom plaintiff acquired its patent rights, there was no showing that he was under the control of plaintiff and hence there is no basis for drawing an adverse inference against plaintiff. Moreover, although Kuramochi was a resident of Japan, either party could have applied to take his deposition under the Federal Rules of Civil Procedure.

This brings us to Buddy L's final, and perhaps most compelling, argument in support of its fee award application—that the Buddy L Easy Writer so plainly did not infringe the Kuramochi patent that Marx's purpose in bringing suit on that claim was harassment.[29] Claim 8 of the Kuramochi patent, which was allegedly infringed, describes placement of the typewriter escapement mechanism (which permits movement of the carriage) in a self-contained cartridge. This cartridge, as used in the Marxwriter, is a rather compact plastic case of the approximate size of a tape cassette and could be installed in or removed from the frame without displacement of any of the parts contained therein. Consequently, the design permitted assembly of the escapement mechanism at a different time and place than the rest of the machine. The Buddy L escapement mechanism, while incorporating a configuration of parts similar to that found in the claim, is built directly on to the frame, and thus pre-assembly, while possible, would entail use of a far bulkier component than that constituting the Marxwriter's embodiment of the claim. Moreover, as the Buddy L mechanism is installed directly on to the frame, it cannot

be removed without displacement of the individual parts. Nonetheless, Marx contends that the Buddy L mechanism was contained in a cartridge and the frame piece into which the parts were mounted was the bottom of the cartridge, the top being a clear plastic cover over these parts. Buddy L argues that under these circumstances, no finding of infringement would be justified; indeed it contends that Marx is estopped from claiming infringement in light of certain statements made to the Patent Office in Marx's prosecution of the patent.[30] Marx's application was initially rejected by the examiner with the statement that "the typical covering and casing acts broadly as a cartridge." In response, plaintiff argued:

> To characterize an invention claimed as a "unitary escapement carriage control" as broadly the same as a typewriter covering and casing is to ignore the broad principles and features on which the instant invention is based.

The claim was then allowed and the Kuramochi patent issued.

■ In view of the Court's sustaining the defense of a prior public sale, the question of infringement need not actually be determined.[31] Suffice it to say that given the ability of defendant's escapement mechanism to be preassembled, plaintiff's claim of infringement, while difficult to prove in light of the above statement, was not so wholly devoid of substance as to warrant the conclusion that the suit's purpose could only be harassment. Under all the circumstances, the application for fees is, in the Court's discretion, denied.

The foregoing shall constitute this Court's Findings of Fact and Conclusions of Law. Judgment is granted on the merits for defendant on all claims and may be entered accordingly.

---

29. *See, e. g., Kahn v. Dynamics Corp. of America,* 508 F.2d 939, 944 (2d Cir. 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975); *Kaehni v. Diffraction Co.,* 342 F.Supp. 523, 535 (D.Md.1972), *aff'd mem.,* 473 F.2d 908 (4th Cir.), *cert. denied,* 414 U.S. 854, 94 S.Ct. 151, 38 L.Ed.2d 103 (1973).

30. *See, e.g., Cohn v. Coleco Indus., Inc.,* 558 F.2d 53 (2d Cir. 1977); *Capri Jewelry, Inc. v. Hattie Carnegie Jewelry, Ltd.,* 539 F.2d 846 (2d Cir. 1976).

31. *Cf. Harries v. Air King Prods. Co.,* 183 F.2d 158, 163 (2d Cir. 1950) (L. Hand, C. J.).