CORPORATE COMMUNICATIONS CONSULTANTS, INC., Plaintiff,

v.

COLUMBIA PICTURES INDUSTRIES INC. and Today Video, Inc., Defendants.

No. 81 Civ. 3236 (JES).

United States District Court, S.D. New York.

Dec. 27, 1983.

Curtis, Morris & Safford, P.C., New York City, for plaintiff; Gregor N. Neff, New York City, of counsel.

Arnold, White & Durkee, Houston, Tex., Columbia Pictures Industries, Inc., New York City, for defendants; John F. Lynch, James J. Elacqua, Houston, Tex., Jared Jussim, New York City, of counsel.

## OPINION & ORDER

SPRIZZO, District Judge:

Plaintiff, Corporate Communications Consultants, Inc. ("CCC"), a New Jersey corporation with its principal place of business in New York, commenced this action for patent infringement pursuant to 35 U.S.C. § 271(a) (1976) against defendants Columbia Pictures Industries, Inc. ("Columbia") and Today Video, Inc. ("Today Video"). CCC is the owner of U.S. Patent No. 4,096,523 (the "Rainbow Patent"). Columbia, a Delaware corporation with its principal place of business in New York, and Today Video, a New York corporation with its principal place of business in New York, are users of color correction computers manufactured by Dubner Computer Systems, Inc. ("Dubner").

Plaintiff, CCC, alleges that the defendants' use of electronic color correction systems incorporating the Dubner computers

infringes claims 1, 6–8, 17, 18, 34–36, 39 and 40 of the Rainbow Patent.[1] CCC seeks damages for past infringement and an injunction prohibiting further infringement. CCC further alleges that defendants' infringement was willful and deliberate, and consequently asks the Court to award treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

Defendant Columbia denies infringement of any of the claims of the Rainbow Patent and argues that the patent is invalid. Columbia also asks for an award of reasonable costs and attorneys' fees.

Only Columbia appeared at trial to contest plaintiff's claims. Defendant Today Video and plaintiff have stipulated that Today Video will be bound by any final decision by this Court with respect to the validity of the claims of the Rainbow Patent and further that if any of the systems or methods of Columbia are found to infringe any claims of the Rainbow Patent, that ruling shall also apply to the corresponding systems and methods used by Today Video. Stipulation and Order dated July 7, 1982. The parties have agreed to sever the issue of damages pending a determination as to liability.

## STATEMENT OF FACTS

### 1. *The Rainbow Patent*

When color video programs originating on motion picture film are telecast, it is frequently necessary to color correct the video signals to make them pleasing to the eye. The need for these corrections may arise from peculiarities in the film emulsion, the electrical characteristics of the camera or the desire to enhance certain colors in a video picture.

CCC's invention, as described in and protected by the Rainbow Patent, is an electronic color correction system designed to make adjustments to the colors of video signals. The system comprises a film chain or telecine (which is a device for projecting light through film to a video tube), a control panel for adjustment of various color parameters (including color balance, luminance, hue and saturation), and a computer to record scene changes and color corrections made to each scene.

In the system's typical operation, a film is loaded into the telecine and advanced to the first frame, at which point a frame counter is engaged. The film is then advanced · until a typical frame, which can serve as a basis for a standard value, is found. This frame is color corrected by an operator at the control panel who adjusts the potentiometers controlling the various color parameters. The values of these adjustments are then stored in the computer as standard values for the entire film.

The film is then rewound and run once again. Additional color corrections, if desired, are made on particular frames by stopping the film and adjusting the potentiometers. The color correction signals thus generated may be of greater or lesser voltage than the standard values previously stored for the film as a whole. The differences between these newly generated color corrections and the standard values are called "increments."

· Once a desirable color mixture has been achieved for a particular frame, the standard values are subtracted from the total corrections and the remaining increments are stored in the computer along with the frame number at which the corresponding corrections occurred. Thus, the computer stores the increments separately from the previously stored standard.

When the entire film has been corrected, a videotape of the film incorporating all the corrections is made by rewinding the film to its starting position and running the projector forward again. The appropriate color corrections are made by the system at the proper frames by recalling the increments from memory and adding them to or subtracting them from the stored standard values. The total corrections are automatically applied to the video signals. The

---

**1.** Dubner is not a defendant in this action. It has, however, been sued in a contemporaneous action filed in the United States District Court of New Jersey. That action has been stayed pending resolution of the instant case.

product is a color corrected videotape suitable for telecasting.

. This is not the first electronic color correction system for video signals. Several such systems, of various capacities, were known in the prior art. *See infra* pp. 1435–1436. Indeed, the primary inventor of the system described in the Rainbow Patent had previously, along with others, obtained U.S. Patent No. 3,610,815 (the "Chromaloc Patent") for a less advanced electronic color correction system.

The Rainbow Patent asserts the novelty of its inventions by reciting two areas in which this system is an advance over the prior art.

The first recited advance of the system described in the Rainbow Patent is its ability to store color correction signals for use at a later time (hereinafter the "Incremental Standards Invention"). The patent discloses three embodiments of the Incremental Standards Invention.

The first embodiment facilitates reuse on later frames of color corrections made on earlier frames. Thus, if while viewing a certain scene, the operator remembers a similar scene which was previously corrected, he can recall those corrections and simply impose them on the current scene, thereby saving a significant amount of time and effort. He can also make further adjustments to the recalled signal for use with the current scene without affecting the values stored for the previous scene in any way. Prior art devices existed which could recall corrections to previous scenes and apply them unchanged to the current scene [2] or which could recorrect prior corrections to the current scene.[3] None existed which could both recall a correction made to a prior scene and apply it with modifications to the current scene as described in the Rainbow Patent.

The second embodiment of the Incremental Standards Invention facilitates compensation for machine drift. Machine drift occurs when, at any time after the color correction process begins for a particular film, the characteristics of the telecine or color correction system change. The Incremental Standards Invention permits the operator to set a new standard and the computer will automatically apply the previously stored increments to the standard at the appropriate frames. This is possible only because the system stores the increments separately from the standard. In all previous systems, the entire correction was stored as one value; if the machine drifted from its previous characteristics, the color correction process would have to begin anew in order to compensate for machine drift.

The third disclosed embodiment of the Incremental Standards Invention facilitates the utilization of the digital storage system. Since the computer memory stores the increments separately, it is possible to recall information with a greater degree of precision.

The second recited advance of the system described in the Rainbow Patent is scene by scene color correction of hue and saturation of the six separate primary and secondary colors (hereinafter the "Hue and Saturation Invention"). Prior art devices existed which were able to correct for color balance on a scene by scene basis [4] or for hue and saturation on an overall basis,[5] but no prior art device or system effectively enabled the operator to provide scene by scene hue and saturation control for separate colors. The advantage of hue and saturation controls is that they enable the operator to correct specific colors in a scene without affecting any other colors and without significantly affecting the white or grey background, something the color balance controls alone cannot do.

---

**2.** Teletronics International's Chromaloc system and the National Video Center/Dubner Color Corrector had this feature.

**3.** The BBC's TARIF system had this feature.

**4.** Teletronics International's Chromaloc system and the National Video Center/Dubner Color Corrector had this feature.

**5.** The RCA Chromacomp, Philips Variable Matrix and Telemation CF–3000 had this feature.

## 2. *The Columbia System*

Columbia is accused of infringing plaintiff's Rainbow Patent at four of its facilities: EUE Screen Gems, Editel Chicago, Editel Los Angeles and Columbia Video Cassettes. The EUE and the two Editel facilities have substantially similar capabilities. They use a telecine connected to the Dubner color correction computer. This system permits scene by scene control of various color parameters including hue and saturation. The system is further able to recall and recorrect a prior scene or recall corrections made to a prior scene and apply them to the current scene with or without modifications. The system, however, does not store standards and increments separately and consequently cannot compensate for machine drift or fine-tune the color corrections to the extent that the Rainbow system can. CCC alleges that both the Incremental Standards Invention and the Hue and Saturation Invention are infringed by Columbia's activities at the EUE and Editel facilities.

The system in operation at the now defunct Columbia Video Cassettes facility used a Topsy computer instead of the Dubner computer. That system was able to recall and reuse prior corrections with changes in substantially the same manner as the other Columbia systems and is therefore alleged to have infringed the Incremental Standards Invention. The system did not, however, have the Hue and Saturation feature, and CCC does not allege that the system used at this facility infringed the claims of its patent covering that feature.

The Court will treat the Incremental Standards Invention and the Hue and Saturation Invention separately.

### THE INCREMENTAL STANDARDS INVENTION

■ The claims defining the Incremental Standards Invention allegedly infringed by Columbia are claims 1, 6–8, 35, 36, 39 and 40. Claim 1 is an independent apparatus claim with claims 6–8 dependent upon it. Claim 35 is an independent method claim with claims 36, 39 and 40 dependent upon it. Since dependent claims are construed to incorporate by reference all the limitations of the claims they are dependent upon, 35 U.S.C. § 112, it is necessary to find infringement of the primary claims in order to find infringement of the dependent claims. *See Dresser Industries Inc. v. United States*, 432 F.2d 787, 792, 193 Ct.Cl. 140 (1970); *Autogiro Co. of America v. United States*, 384 F.2d 391, 408, 181 Ct.Cl. 55 (1967); *Leesona Corporation v. Varta Batteries Inc.*, 522 F.Supp. 1304, 1314 (S.D. N.Y.1981).

Claim 1 reads:

A color correction system comprising, in combination, means for converting images recorded on an image record medium to video color component signals, means for setting standard correction signal levels for said component signals, adjusting means for adjusting said color component signals for different ones of said images and developing incremental values of said correction signals over said standard values, storage means, and *means for storing signals corresponding to said incremental values* in said storage means. (Emphasis added)

■ A plain reading of the language of this claim makes it evident that the incremental values developed by this system are stored separately from the standard, which Columbia's system clearly does not do.

Plaintiff seeks to escape the seemingly obvious conclusion that Columbia's systems do not infringe claim 1 by arguing that the word "corresponding" contained in claim 1 should be read to mean "a function of." Thus, according to this contention, the value of the entire correction, comprising the standard plus the increment, is a function of the increment since the whole value varies as the increment alone varies. CCC concludes therefore that Columbia's systems, which store entire color correction values, infringe the Rainbow Patent.

This contention is flatly refuted by the plain language of claim 35 which reads as follows:

A method of color-correcting uncorrected electrical video color component signals, said method comprising the steps select-

ing standard levels for said color component signals, *storing signals corresponding to said standard levels,* of sequentially displaying video pictures composed from said uncorrected signals, stopping the sequential display step to provide a stationary display of a picture in a scene requiring color correction, locating scene changes by providing means for developing electrical scene-location signals, *storing adjustment signals corresponding to the values of the differences between said standard levels and the levels of signals used to obtain a color-corrected picture for said scene,* storing color component adjustment signals, repeating said displaying, stopping, locating and storing steps for each other scene requiring color correction, selecting reference levels for said color component signals, and reading said adjustment signals out of storage under the control of said scene location signals and using said adjustment signals to modify said reference color component signals. (Emphasis added)

Thus, the very same word "corresponding" is used with reference to the storage of *standard* values as well as incremental values. It is not reasonable to conclude that the very same word should be construed as having an entirely different meaning when applied to incremental values than it has when applied to standard values. Indeed, to accept plaintiff's contention would render the language "storing signal corresponding to said standard values" mere surplusage, because under plaintiff's interpretation the storage of the incremental value would encompass the storage of the standard value. This is a highly improbable conclusion given the care and precision with which patent claims are presumably prepared. As a consequence, the Court concludes that the word "corresponding" must be construed to mean "equal to," and therefore Columbia's systems do not infringe the Incremental Standards aspect of the Rainbow Patent.

■ The specifications of the patent afford further support for this conclusion. Although the claims of a patent define the boundaries of the protection given by the patent, *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 149, 71 S.Ct. 127, 128, 95 L.Ed. 162 (1950); *Maclaren v. B–I–W Group, Inc.,* 535 F.2d 1367, 1372–73 (2d Cir.), *cert. denied,* 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976), the Court may look to the patent's specifications to determine a proper construction of those claims. *United States v. Adams,* 383 U.S. 39, 48–49, 86 S.Ct. 708, 712–713, 15 L.Ed.2d 572 (1966); *Maclaren v. B–I–W Group, Inc.,* 535 F.2d at 1372–73. The specifications do not support plaintiff's strained reading of the patent. *See* Specifications of the Rainbow Patent, column 2, line 1 ("[T]he color of each scene of a motion picture or other film is corrected by setting and storing the incremental values of the correction signals ...."); *Id.* at column 2, line 22 ("Since only incremental values are stored, ..."); *Id.* at column 7, line 13 ("In the computer, the standard values are subtracted from the incremental values, and only the incremental values are stored in the computer memory."). It is therefore clear that the separate storage of incremental values is an essential element of the invention claimed in the Rainbow Patent which Columbia's systems do not infringe.[6]

---

6. There is an additional reason to reject CCC's construction of the claims here in issue. The grant of a patent bars others from intruding without permission upon the patent's domain for a number of years. The function of the claims in a patent is to delineate the boundaries of that domain. Those boundaries must be carefully drawn so that they neither describe an area broader than the actual invention, nor include that which is already in the public domain.

The claims allowed by the patent examiner for this invention were for a system for "developing incremental values" and for "storing signals corresponding to said incremental values." To allow plaintiff to now claim that the words "corresponding to said incremental values" should be given a meaning other than that which a plain reading suggests would so obscure the parameters of the claim that those reading it would have no basis to know when their conduct would or would not infringe plaintiff's patent. *See Georgia-Pacific Corp. v. United States Plywood Corp.,* 258 F.2d 124, 136 (2d Cir.), *cert. denied,* 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

■ The Court also finds that Columbia's systems do not infringe under the doctrine of equivalents, which requires that the device perform "substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Products*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (quoting *Sanitary Refrigerator Company v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)). Columbia's systems do not perform color corrections in substantially the same way as the device set forth in plaintiff's patent. Given that circumstance, the fact that Columbia's systems permit an operator to apply previous corrections to current scenes is not in itself sufficient to bring it within the doctrine of equivalents.

Since this Court has concluded that claims 1, 6–8, 35, 36, 39 and 40 of the Rainbow Patent are not infringed by any of the systems or methods of Columbia, it is unnecessary to reach the question of whether these claims of the Rainbow Patent are valid.

## THE HUE AND SATURATION INVENTION

■ Columbia does not deny that its systems are able to correct hue and saturation of the six primary and secondary colors on a scene by scene basis in substantially the same way and with the same result as described in the Rainbow Patent. Trial transcript at 309–10, 523–24 ("Tr. ——"). Neither does Columbia allege that the Hue and Saturation Invention as claimed in claims 17, 18 and 34 of the Rainbow Patent, lacks novelty pursuant to 35 U.S.C. § 102. Columbia's contention is that this particular invention would have been obvious at the time the invention was made to a person of ordinary skill in the pertinent art and is therefore invalid under 35 U.S.C. § 103.

Columbia, in support of its contention of obviousness, cites as pertinent prior art the RCA Chromacomp circuit, the Philips Variable Matrix module, the National Video Center/Dubner Color Corrector ("NVC"), the Chromaloc system of Teletronics International, the Fernseh literature, the TARIF system of the British Broadcasting Corporation, and the Telemation TCF–3000 film chain with CF–3000 color corrector. All of these were either on sale or in use in the United States or described in printed literature prior to the Hue and Saturation Invention.

The RCA Chromacomp circuit had both color balance controls and hue and saturation controls for separate colors; however, these controls were difficult to adjust [7] and were only used to make overall corrections at the beginning of a film, not on a scene by scene basis. The Philips Variable Matrix was similar to the RCA Chromacomp and was also equipped with circuitry which permitted external D.C. voltage control.

The NVC system used an earlier model Dubner computer for scene by scene control of color balance. The Chromaloc system used nine banks of potentiometers for controlling color balance values of up to nine scenes. The Chromaloc Patent further disclosed the possibility of a digital computer taking over the function of the potentiometer banks. Neither the NVC nor the Chromaloc systems, however, controlled hue and saturation.

The German Fernseh and the British TARIF literature both suggested generally the control of various color correction parameters on a scene by scene basis. The Fernseh literature, however, did not specifically discuss scene-by-scene control of hue and saturation, and the TARIF system, as used, did not control hue and saturation.

The Telemation TCF–3000 with CF–3000 color-corrector was a D.C. controllable corrector, including a remote panel of potentiometers to control color-balance and hue and saturation of the six separate colors. The system as used, however, also did not control hue and saturation on a scene by scene basis.

---

**7.** The potentiometers could only be adjusted by screwdriver and were not located on a control panel where an operator could quickly manipulate them.

Columbia claims that in view of this prior art it would have been obvious to one skilled in the art to combine the teachings of the prior art to produce a system able to remote control not only color balance but also hue and saturation of the separate primary and secondary colors on a scene by scene basis.

The Supreme Court has set forth the standard for judging the obviousness of an invention.

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966). Moreover, obviousness must be determined with reference to the time of the invention and not by hindsight. 35 U.S.C. § 103; *see Graham*, 383 U.S. at 36, 86 S.Ct. at 703; *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 773, 774 (Fed. Cir.1983); *Timely Products Corporation v. Arron*, 523 F.2d 288, 294 (2d Cir.1975).

It is true and indeed undisputed that hue and saturation could be controlled for the six primary and secondary colors, albeit not on a scene by scene basis, in the RCA Chromacomp and Philips Variable Matrix. The Telemation CF–3000 went a step further and permitted remote DC control of hue and saturation adjustments present in a Philips type matrix, but not on a scene by scene basis. Tr. at 821–22. The scene by scene control concept was present in the NVC and Chromaloc systems, although not for hue and saturation. However, the existence of this prior art is not dispositive of or even persuasive on the obviousness issue.

This is especially true since those skilled in the art did not believe that the hue and saturation controls in the Chromacomp could be effectively remoted for scene by scene correction. Tr. at 67, 132. Nor was the Philips Variable Matrix believed to be adjustable while in operation. Tr. at 564. Indeed, the control knobs on the Telemation CF–3000 were behind a hinged panel to prevent the operator from having access to them during the operation of the camera. Deposition of Henry Maynard, Plaintiff's Exh. 72 at 61–62. Moreover, TARIF literature, strongly relied upon by the defendant for its contention that scene by scene hue and saturation control was obvious, specifically states, "It is important that the operation of the programmer should not add to the load on the telecine operator and, ideally, he should have no extra controls to worry about." Defendant's Exh. B–19 at 634–35.

Against this background, it becomes apparent that, if anything, the prior art would have led one skilled in the art to conclude that remote control scene by scene correction of hue and saturation was not feasible. *Cf. United States v. Adams*, 383 U.S. 39, 51–52, 86 S.Ct. 708, 714–715, 15 L.Ed.2d 572 (1966). It is also highly significant that, although scene by scene hue and saturation correction is clearly desirable (as is evidenced by the commercial success of the plaintiff's patent, *see infra* p. 1436), no one skilled in the art had managed to effectively achieve that result prior to the issuance of the Rainbow Patent. That circumstance is far more persuasive on the obviousness issue than the hindsight assertions of Columbia's counsel, which do not answer or even address the question of why, if scene by scene hue and saturation corrections were so obvious, they had not been effectuated by any of the prior art.

Moreover, as noted above, CCC has adduced abundant evidence of the Rainbow Patent's commercial success, one of the secondary characteristics of nonobviousness set forth in *Graham*. *See Graham v. John Deere Co.*, 383 U.S. 1, 18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). Indeed, even Columbia's counsel admitted that the

system was a commercial success. Tr. at 15–16. Teletronics International had used one of the slower Chromaloc machines for several years, yet encountered such a heavy demand for its first machine which incorporated the Rainbow system that it had to build a second model. Tr. at 150–51. Similarly, EUE and Editel had a total inventory of only three Chromaloc-type machines before ordering the first machine using the scene by scene hue and saturation invention. Thereafter, they rapidly increased that number. Tr. at 419–20. In addition, Columbia's color correction business has increased dramatically in the years since the new systems were installed.[8] Plaintiff's Exh. 12.

Columbia argues that the Court should ignore this evidence of commercial success because in this case the issue of obviousness can be resolved on the basis of the primary considerations set forth in *Graham* and that it is therefore improper to rely upon secondary considerations. *See Digitronics Corp. v. New York Racing Association, Inc.*, 553 F.2d 740, 748 (2nd Cir.), *cert. denied*, 434 U.S. 860, 98 S.Ct. 187, 54 L.Ed.2d 133 (1977). This argument lacks merit.

This is clearly not a case in which the primary considerations set forth in *Graham* are or should be dispositive. On the contrary, this is precisely the type of case in which the possibility of a hindsight judicial evaluation as to obviousness necessitates the consideration of secondary factors. As the Second Circuit stated in *Shackelton v. J. Kaufman Ironworks, Inc.*, 689 F.2d 334 (2d Cir.1982), *cert. denied*, — U.S. ——, 103 S.Ct. 1500, 75 L.Ed.2d 931 (1983), in language that seems especially appropriate here:

> The supplementary indicia of nonobviousness outlined by the Court in *Graham*

are particularly helpful in a case such as this one where the dangers of hindsight are great. These indicia may be the only warning to a judge that he is engaging in backward vision when an invention that seems obvious to him when studied in argumentative context eluded those skilled in the art at the time the invention was created despite a then long-felt need for the invention and the then possibility of significant commercial reward.

*Id.* at 340, fn. 4 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966); *see also Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 773 (Fed.Cir.1983); *Eutectic Corp. v. Metco Inc.*, 579 F.2d 1, 4 (2d Cir.), *cert. denied*, 439 U.S. 867, 99 S.Ct. 192, 58 L.Ed.2d 177 (1978); *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.*, 372 F.2d 263, 269 (2d Cir.1967); *Reiner v. I. Leon Co.*, 285 F.2d 501, 504 (2d Cir.1960); *cert. denied*, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).[9]

Columbia further contends that the patent examiner did not have the most relevant prior art before him because the patent only cites one prior art reference, U.S. Patent No. 3,893,166 to Pugsley. Assuming, *arguendo*, that this were true, it would do no more than weaken the presumption of validity that attaches to the patent. *Triax Company v. Hartman Metal Fabricators, Inc.*, 479 F.2d 951, 954 (2d Cir.), *cert. denied*, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 740 (1973); *Reeves Brothers, Inc. v. U.S. Laminating Corp.*, 417 F.2d 869, 872 (2d Cir.1969). It would not and does not persuade the Court that the invention was obvious. In any event, the body of the patent disclosure discusses both the Chro-

---

**8.** Columbia argues that their increase in business reflects the overall quality of their services. However, it is far more reasonable to conclude and the Court finds that this increase is a consequence of the one clearly discernable variable in their business, i.e., the new equipment. It is also reasonable to conclude that the rapid customer acceptance of the new system is based upon its incorporation of the Hue and Satura-

tion Invention which clearly improves the quality of the final product.

**9.** It should also be noted that in *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), decided the same day as *Graham,* the Supreme Court based a finding of nonobviousness on the overcoming of prior prejudice, a factor which Columbia now urges this Court to disregard.

1438

maloc system and the Chromacomp circuit, which taken together are at least as relevant as any of the other prior art references cited by Columbia with respect to the Hue and Saturation Invention. Plaintiff's Exh. 1 at column 1, line 10 and column 10, lines 33–35.

Columbia also argues that claim 34 fails to meet the requirement in 35 U.S.C. § 112 that claims particularly point out and distinctly claim the subject matter regarded as the invention. This contention must be rejected.

Claim 34 states:

A method of color-correcting uncorrected electrical *video color component signals,* said method comprising the steps of sequentially displaying video pictures composed from said uncorrected signals, stopping the sequential display step to provide a stationary display of a picture in a scene requiring color correction, locating scene changes by providing means for developing electrical scene-location signals, storing adjustment signals for adjusting the hue and saturation values for said video signals, repeating said displaying, stopping, locating and storing steps for each other scene requiring color correction, and reading said adjustment signals out of storage under the control of said scene location signals and using said adjustment signals to modify *said reference color component signals.* (Emphasis added)

Plaintiff's expert witness admitted that the term "said reference color component signals" at the end of the claim was erroneous and that the claim should read "said video color component signals." Tr. at 742–43. Columbia has not shown, however, that anyone reading the claim could reasonably have misunderstood it. The only previous mention of a "color component signal" is at the beginning of the claim where it is called a "video color component signal." Thus, it is unlikely that anyone reading the claim would construe that language as having any meaning other

than as referring to a video color component signal.

The Court therefore finds that claim 17 (for a system using hue controls in scene by scene color correction), claim 18 (for a system using saturation controls in scene by scene color correction) and claim 34 (for a method of making the hue and saturation corrections) are valid. Since Columbia has conceded that its systems achieve substantially the same result in substantially the same way it follows that Columbia has infringed claims 17, 18 and 34 at its EUE, Editel Chicago and Editel Los Angeles facilities.

WILLFULNESS

■ CCC contends that Columbia was apprised of the probability of infringement and failed to take action. *See* Plaintiff's Exh. 39. However, that fact alone is not sufficient under the circumstances of this case to demonstrate willfulness. Plaintiff must persuade the Court that, at the time of its infringement, Columbia's belief that the invention was obvious was unreasonable. *See Maclaren v. B–I–W Group Inc.,* 401 F.Supp. 283, 304–05 (S.D.N.Y.1975) *rev'd on other grounds,* 535 F.2d 1367 (2d Cir.), *cert. denied,* 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976). Plaintiff has not discharged that burden.

■ The unreasonableness of defendant's belief is not established merely by a subsequent judicial determination rejecting defendant's assessment of plaintiff's claim. Rather, the willfulness of defendant's conduct must be measured as of the time of the conduct involved, not retrospectively, and certainly not solely on the basis of a subsequent finding of infringement.

■ Plaintiff relies heavily on the fact that defendant did not obtain an opinion from patent counsel to support the claim that defendant's conduct was willful, citing *Underwater Devices Inc. v. Morrison-Knudsen Co.,* 717 F.2d 1380 (Fed.Cir.1983). However, that case holds merely that a court would not be guilty of an abuse of

discretion in concluding that willfulness is established by that circumstance. It does not remotely suggest that a finding of willfulness is compelled by that circumstance.

Nor is this an exceptional case justifying the imposition of attorneys' fees. The claims and the defenses were neither frivolous nor asserted in bad faith. *See Dennison Manufacturing Company v. Ben Clements and Sons, Inc.,* 467 F.Supp. 391, 428–29 (S.D.N.Y.1979). The Court therefore finds no liability for treble damages pursuant to 35 U.S.C. § 284 and none for attorneys' fees pursuant to 35 U.S.C. § 285.

## CONCLUSION

Claims 1, 6–8, 35, 36, 39 and 40 of U.S. Patent No. 4,096,523 are not infringed by Columbia at any of its facilities.

Claims 17, 18 and 34 of U.S. Patent No. 4,096,523 are valid and are infringed by Columbia at its EUE Screen Gems, Editel Chicago and Editel Los Angeles facilities. Columbia is hereby enjoined from further infringing activities.[10] The amount of damages owing to CCC will be determined at a later proceeding, after additional discovery.

The Court finds no liability for increased damages for the infringement of claims 17, 18 and 34. Each side is to bear its own costs and attorneys' fees.

It is SO ORDERED.

---

10. Since defendant Today Video has stipulated that it will be bound by this Court's determination of the issues in this case, it likewise is liable for infringement of claims 17, 18 and 34 of U.S. Patent No. 4,096,523 and is enjoined from further infringing conduct.