758 F.2d 167
 225 U.S.P.Q. 805
 KWIK-SITE CORPORATION, Ivan Jiminez, and Irving Rubin,
Plaintiffs-Appellees (82-1652/82-1900), Counter
Defendants-Appellants (82-1701),
v.
CLEAR VIEW MANUFACTURING COMPANY, INC., Gerald Weast and
Norman Weast, d/b/a Neumann's Gun Shop,
Defendants-Appellants (82-1652/82-1900),
Counter Plaintiffs-Appellees (82-1701).
 Nos. 82-1652, 82-1701 and 82-1900.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 31, 1984.
Decided March 27, 1985.
As Amended April 5, 1985.
Rehearing Denied May 3, 1985.
 
 Joseph R. Papp (argued), Harness, Dickey & Pierce, Birmingham, Mich., for defendants-appellants in Nos. 82-1652 and 82-1900.
 Clifford R. Williams (argued), Detroit, Mich., for plaintiffs-appellees in Nos. 82-1652 and 82-1900.
 Clifford R. Williams (argued), Detroit, Mich., for counter defendants-appellants in No. 82-1701.
 Joseph R. Papp (argued), Harness, Dickey, & Pierce, Birmingham, Mich., for counter plaintiffs-appellees in No. 82-1701.
 Before EDWARDS, Circuit Judge,* BROWN, Senior Circuit Judge, and DOWD, District Judge.**
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 This action for patent infringement, brought pursuant to 35 U.S.C. Secs. 271, 281, involves three separate patents, all of which relate to mounts for rifle sights. The parties involved are Kwik-Site Corporation, a Michigan corporation, and its principals Ivan Jiminez and Irving Rubin (hereinafter referred to as Kwik-Site) and Clear View Manufacturing Company, Inc., a Michigan corporation, and its principals Gerald Weast and Norman Weast (hereinafter referred to as Clear View).
 
 
 2
 Initially, Kwik-Site filed an action alleging: (1) a claim that Clear View was infringing Kwik-Site's Design Patent Number 231,674 (D.'674); (2) a claim of unfair competition pursuant to the Lanham Act, 15 U.S.C. Sec. 1125(a); and (3) a state law claim of misappropriation of business values and unfair competition. Clear View denied these allegations and filed several counterclaims, the relevant one being that Kwik-Site was infringing Clear View's Design Patent Number 248,309 (D.'309). Kwik-Site denied the counterclaims and amended its complaint to allege that Clear View was infringing Kwik-Site's Patent Number 3,724,800 ('800).
 
 
 3
 On the issue whether Kwik-Site infringed Clear View's patent D.'309, the district court granted Clear View's motion for summary judgment and (1) held that Clear View's patent D.'309 was valid and was infringed by Kwik-Site's Kwik-Mount/22 and (2) awarded damages. Kwik-Site has appealed this grant of summary judgment and award of damages.
 
 
 4
 A five day bench trial was held on the other issues. In an unpublished opinion, the district found: (1) Kwik-Site patent '800 was valid and had been infringed by Clear View; and (2) Kwik-Site patent D.'674 was valid and had been infringed by Clear View. The court also found Clear View guilty of unfair competition in violation of the Lanham Act, 15 U.S.C. Sec. 1125(a), and further held that Clear View's willful infringement entitled Kwik-Site to treble damages under 35 U.S.C. Sec. 284. The district court thereafter granted an injunction in favor of Kwik-Site to enforce its holdings. Clear View has appealed each of these holdings.
 
 
 5
 On appeal, we affirm the trial court's grant of Clear View's motion for summary judgment holding Clear View patent D.'309 valid and infringed and the award of damages. We reverse the trial court's holding that Kwik-Site patent D.'674 was valid and was infringed and hold instead that patent D.'674 is invalid. We reverse the trial court's holding that Kwik-Site patent '800 was valid and infringed and instead hold that patent '800 is invalid. Regarding liability for unfair competition under the Lanham Act, we reverse the district court and hold that Kwik-Site failed to establish any Lanham Act violation. Finally, having found invalid both Kwik-Site patents D.'674 and '800, we reverse the trial court's award of treble damages under 35 U.S.C. Sec. 284.
 
 
 6
 I. Trial Court's Grant of Summary Judgment on D.'309
 
 
 7
 After extensive discovery had been completed, Clear View filed several motions for summary judgment, only one of which was granted and is on appeal to this court. In that motion, Clear View alleged that Kwik-Site's Kwik-Mount/22 infringed Clear View's design patent D.'309. Although Kwik-Site filed memoranda in opposition to Clear View's other motions for summary judgment, Kwik-Site did not respond at all to Clear View's motion for summary judgment on the issue of Kwik-Site's infringement of D.'309.[1]
 
 
 8
 At the hearing on Clear View's motion for summary judgment, Kwik-Site argued that a mount manufactured for over eighteen years by Selco Manufacturing Company, a North Carolina firm, was substantially identical to that covered by D.'309 and therefore was prior art. Kwik-Site's counsel presented a brochure from Selco and contended that it described such a mount. Kwik-Site also introduced into evidence its Kwik-Mount/22 accused of infringing the D.'309 and offered to have Kwik-Site personnel testify that the Kwik-Mount/22 was not similar to the D.'309. Kwik-Site did not, however, offer any affidavits in support of its contentions but, during the hearing, did ask the trial judge for a delay in order to obtain an affidavit from the North Carolina manufacturer regarding how long he had been manufacturing the allegedly identical sight. The trial court denied Kwik-Site's request for delay on the ground that the products shown in the brochure were in no way similar to the D.'309, and therefore it was irrelevant when those products were manufactured. Then, based on its visual comparison of Kwik-Site's Kwik-Mount/22 with Clear View's D.'309 mount, the court found that to the ordinary observer the two mounts were so similar as to constitute infringement of the D.'309. There being no genuine issue of material fact, the court granted Clear View's motion for summary judgment on the issue of Kwik-Site's infringement of D.'309 and later awarded damages.
 
 
 9
 Although Kwik-Site attempted to oppose Clear View's motion for summary judgment on two grounds, i.e., that there was "pre-existing art," and that its product did not infringe D.'309, on appeal Kwik-Site contends only that the district court abused its discretion in not allowing Kwik-Site to offer, by affidavit or in other proper manner, proof of the Selco mount and that the Selco mount was prior art.
 
 
 10
 We conclude, however, that there was no abuse of discretion because the proof showed without dispute that Kwik-Site had knowledge of the Selco mount at least a week before the hearing on the summary judgment motion and had neither obtained proof nor requested a continuance, prior to the hearing, in order to obtain proof.
 
 
 11
 We therefore affirm the grant of summary judgment for infringement of the D.' 309 patent and the award of damages.
 
 II. Validity of Design Patent D.'674
 
 12
 The second major issue on appeal is the correctness of the trial court's ruling that Kwik-Site's Design Patent Number 231,674 (D.'674) is valid and is infringed by Clear View's See Through mount. At trial Clear View contended D.' 674 was invalid for several reasons, many of which the trial court addressed and found meritless. The trial court's opinion, however, did not directly address the issue whether, as Clear View contends, D.'674 is invalid for the reason that its configuration, which distinguishes it from prior art, is functional and utilitarian rather than ornamental. Indeed, the trial judge held that it was the functional and utilitarian configuration of D.'674 that made it patentable. (Jt.App. 248). Thus, the very reason that the district court held D.'674 valid is precisely the reason why it is invalid.
 
 
 13
 A design patent may be issued for "any new, original and ornamental design for an article of manufacture." 35 U.S.C. Sec. 171 (emphasis added). In order to be valid, a design patent "must disclose a design that is new, original and ornamental, unanticipated and inventive in character, and beyond the skill of the ordinary designer or draftsman ... A design patent cannot be obtained to protect a mechanical function or cover an article whose configuration affects its utility alone." Spaulding v. Guardian Light Co., 267 F.2d 111, 112 (7th Cir.1959) (citations omitted) (emphasis added). See for same proposition Schwinn Bicycle Co. v. Goodyear Tire & Rubber Co., 444 F.2d 295, 298 (9th Cir.1970); Barofsky v. General Electric Corp., 396 F.2d 340, 342 (9th Cir.1968), cert. denied, 393 U.S. 1031, 89 S.Ct. 644, 21 L.Ed.2d 575 (1969); Methode Electronics, Inc. v. Elco Corp., 385 F.2d 138, 141 (3d Cir.1967); Bentley v. Sunset House Distributing Corp., 359 F.2d 140, 145 (9th Cir.1966).
 
 
 14
 A see through mount is an apparatus that attaches to the top of a rifle and functions to hold a telescopic sighting device above and provides an area below through which the iron sight may be used. The see through mounts at issue here are comprised of two metal rings, one on top of the other. The top (mounting) ring is round in shape and holds a telescopic sighting device. The lower ring, or underscope, is a kidney-shaped opening that allows the shooter an unmagnified view for sighting without removing the telescopic sight. Figures 1 and 2, Appendix hereto, depict a see through mount and illustrate how the mount appears when attached to a rifle. Figures 3 and 4, Appendix, show two views of the mount embodied in Kwik-Site's patent D.'674.
 
 
 15
 Clear View correctly contends the only feature distinguishing the D.'674 see through mount from prior art is the enlargement of the lower ring. According to Clear View, and we agree, altering the configuration of the lower ring to a broader, flatter shape served only functional, not ornamental, purposes, and therefore D.'674 is invalid.
 
 
 16
 In its brief, Kwik-Site unartfully attempts to rebut the argument that the D.' 674's configuration affects only its utility by stating:
 
 
 17
 [T]he evidence clearly presented [sic] indicated that Plaintiff's [D.'674] mount was the first to utilize the unique design dip feature which allows for non-scope/underscope sighting, with a wide view [sic] of vision. It was not a utility patent, but a design patent and the testimony adduced at the time of trial indicated the design patent features of the mount. The dip feature was not a functional feature of the patent. How is a dip going to be a functional feature. The totality of the design was the design feature ruled upon by the Court at the time of trial.
 
 
 18
 (Kwik-Site Brief at 23).
 
 
 19
 As discussed in the following paragraphs, this court finds that the wider, flatter underscope bed of the D.'674 is a functional configuration affecting only the utility of the mount. Therefore, we hold the D.'674 invalid.
 
 
 20
 We first address Kwik-Site's erroneous contention that the dip feature, whereby the upper ring dips into the underscope sighting bed, is unique to the D.'674 patent. The trial testimony of Mr. Jiminez, Kwik-Site's appellate brief, and the trial court's opinion all imply that the dip feature of the D.' 674 is new and unique. But an examination of the prior art cited in the D.'674 patent application establishes that Mr. Jiminez and Mr. Rubin previously had patented a see through mount for a telescopic rifle sight. (Design Patent Number 220,483) (D.'483) that incorporated the same dip feature as found in D.' 674. In fact, Mr. Jiminez testified that since 1969 he had utilized the dip in all of his see through mounts. (Tr. 5/14/82, am, at 50). The only distinction between Kwik-Site's D.'674 and its earlier D.'483 is that the underscope bed of D.'674 is kidney-shaped while the underscope of D.'483 is round. (Tr. 5/20/82 at 79-80). Thus, this kidney-shaped, flatter, wider underscope bed, not the dip, is the unique feature of D.'674's design.
 
 
 21
 Contrary to Kwik-Site's argument on appeal, the record is devoid of any ornamental feature of the D.'674 Kwik-Site mount. Rather, the evidence illustrated that the kidney-shaped underscope bed served only functional purposes. The trial testimony of Mr. Jiminez, designer of D.'674, established that the D.'674's enlarged underscope sighting bed allowed the viewer, when aiming the rifle, to position his face closer to the scope and thus get a better view through the sight. The D.'674's wider, flatter underscope bed enabled the scope to be positioned closer to the rifle so that the viewer did not have to raise his eyes to aim. Additionally, the underscope bed's added width also allowed the viewer to see more of the target than could be seen through prior, narrower underscope beds.
 
 
 22
 Since all the evidence demonstrated that the D.'674's configuration served only utilitarian purposes, and since a design patent may not be obtained to "cover an article whose configuration affects its utility alone," Spaulding v. Guardian Light Co., 267 F.2d at 112, we find invalid Kwik-Site's patent D.'674.
 
 III. Validity of Patent '800
 
 23
 As the third major issue on appeal, Clear View challenges the trial court's holding that Kwik-Site's Patent Number 3,724,800 ('800), is valid and is infringed by Clear View's Side Mount 94. The district court found that patentees Rubin and Jiminez had not breached their duty of frank and truthful disclosure to the Patent and Trademark Office and that any misstatements in the '800 patent application were mere technical misstatements insufficient to establish fraud. Moreover, the district court examined the prior art and found that Clear View had not met its burden of establishing the obviousness of claim 5 of the '800 patent. Our examination of the record convinces us that in reaching this conclusion the district court made several factual findings that we believe are clearly erroneous and that led the district court to incorrectly conclude that claim 5 was valid. Because we find the disputed claim 5 reads directly on the prior art, we reverse the district court and hold claim 5 invalid under 35 U.S.C. Sec. 103.
 
 A. Legal Evaluation for Obviousness
 
 24
 Although a patented invention may meet the requirement of novelty under 35 U.S.C. Sec. 102, "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains," then the claimed invention is obvious and therefore invalid. 35 U.S.C. Sec. 103. The issue of obviousness-nonobviousness is ultimately determined as a conclusion of law reviewable by an appellate court, Nickola v. Peterson, 580 F.2d 898, 910-11 (6th Cir.1978); but this legal conclusion is based on factual findings which are binding on appeal unless they are clearly erroneous, id. at 911 (citing Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966) ). See Vandenberg v. Dairy Equipment Co., 740 F.2d 1560, 1565 (Fed.Cir.1984).
 
 
 25
 To determine obviousness under 35 U.S.C. Sec. 103: (1) the scope and content of the prior art are to be determined; (2) differences between the prior art and the claims at issue are to be ascertained; (3) the level of ordinary skill in the pertinent art is to be resolved; (4) the obviousness or nonobviousness of the subject matter is to be determined; and (5) such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented, since these may have relevancy as indicia of obviousness. Nickola v. Peterson, 580 F.2d at 911 (citing Graham v. John Deere Co., 383 U.S. at 17, 86 S.Ct. at 693). As post-Graham decisions have clarified, so-called "secondary considerations" must be considered by a court before coming to a conclusion regarding obviousness. Vandenberg v. Dairy Equipment Co., 740 F.2d at 1567; Nickola v. Peterson, 580 F.2d at 911 n. 21.
 
 B. Claim 5
 
 26
 Claim 5 of Kwik-Site's patent, the only claim at issue provides:
 
 
 27
 In a rifle having a side receiver cover plate formed with a number of horizontally axised screw receiving holes through which screws are inserted for fastening the plate to its adjacent rifle structure, and a telescopic sight mounting comprising a horizontally elongated, narrow, thin bar arranged on one long edge and adapted for fastening in face to face contact with the side receiver cover plate of a rifle; and a pair of ring-shaped clamps each having a base arranged upon the upper long edge of the bar, with one clamp near the forward, relative to the rifle end of the bar and the other being near the rear end of the bar, with the two clamps being axially aligned for clamping a telescopic sight extending therethrough, in substantially parallel alignment with the bar length and thus the rifle barrel; the improvement comprising:
 
 
 28
 means for fastening the bar to the rifle, comprising screw holes horizontally extending through the bar and pre-arranged in horizontal alignment with a number of the receiver plate screw holes, including screws of sufficient length for extending through said aligned screw holes in the bar and plate, replacing the original screws used for originally fastening the plate to the rifle structure, for consequently fastening both the bar and the cover plate together as a unit to the adjacent rifle structure.
 
 
 29
 Figures 5 and 6, Appendix, are drawings from the '800 patent and show the patented invention as it is installed on a rifle.
 
 C. The Winchester 94 Rifle
 
 30
 Before discussing the patented invention, it is helpful to briefly review the history of the Winchester 94 rifle onto which the invention is designed to be mounted. The Winchester 94 rifle ejects spent cartridges in such a manner as to make it necessary to mount any sight from the left side of the receiver. Located on the left side of the receiver are three screw holes. The forward-most screw hole has been present on the Winchester 94 since the 1890's; into it fits a screw which functions to retain a pin that connects the bolt and lever. (Tr. 5/13/82 at 76). The other two screw holes are located toward the rear of the receiver and hold screw plugs which themselves serve no functional purpose. These two screw holes were added to the Winchester 94 in the 1940's at the request of gunsmiths and gunsight manufacturers, to facilitate mounting a receiver sight[2] on the 94 rifle. Prior to the addition of the two screw holes, installation of a sight or a mount for a sight necessitated the drilling of holes in the receiver--a time consuming task that required the skill of a gunsmith, was costly to the gunowner and depreciated the value of the rifle. Winchester's addition of the two pre-drilled screw holes standardized installation of a receiver sight and eliminated the need for drilling holes in the receiver.
 
 D. The Patented Invention
 
 31
 The patented invention, allegedly embodied in Kwik-Site's Side Mount 94, is a mount that attaches to the left of the Winchester 94 receiver and that holds a telescopic gunsight. According to Kwik-Site, the '800 patent adapted the use of the Winchester 94's two pre-drilled screw holes and additionally taught the use of the third (forward) screw hole for attaching a mount for a telescopic sight to the Winchester 94 rifle. In the words of the district court, the device embodied by the '800 patent:
 
 
 32
 was designed to mount and hold a telescopic gunsight (of standard one-inch diameter) on top of the barrel of a "Winchester 94" rifle.... It consists of a steel bar, 5"' in length, 1/2"' tall, and 3/4"' thick, bearing two one-inch diameter adjustable rings at each end of its upper surface, which rings will hold a telescopic sight. The bar is punctured by three screw holes drilled to align perfectly with the three screw holes present on the left side of the receiver of a Winchester 94 Rifle. By removing the rifle's three screws and attaching the mount with the three longer screws provided therewith, the telescopic sight automatically aligns with the boresight target plane, and the rifle's user is given a true shot at his target. The mount attaches to the left side of the rifle so that ejection of spent cartridges from the right side of the receiver is unimpeded.
 
 
 33
 (Jt.App. 227; Tr.Ct.Opin. 4).
 
 E. Prior Art
 
 34
 Because the use of the Winchester 94's pretapped screw holes for mounting receiver sights was well known, Clear View argued that the '800 patent was obvious under 35 U.S.C. Sec. 103 and introduced examples of prior art to substantiate its contention. Relevant prior art included receiver sights that attached to the Winchester 94 via use of the two rear screw holes as well as a telescopic sight, the Boone scope, that mounted on the 94 in the same manner. The Boone scope, according to the district court, "is a two-piece telescopic sighting device which attaches to the receiver of the Winchester 94 Rifle by alignment of two preexisting holes in its mount with the two rear screw holes in the receiver of the rifle. The Boonescope has been marketed since the 1950's and was, apparently, the first telescopic sighting device to include predrilled mount screw holes which aligned with any of those in the receiver of the rifle." (Jt.App. 233; Tr.Ct.Opin. 10). The prior art also included another side mount for the Winchester 94, a Williams mount, which utilized the front hole of the 94 receiver. But, unlike the receiver sights and the Boone scope, the installation of this Williams mount required a gunsmith to drill and tap additional holes in the receiver.
 
 
 35
 The '800 patent file contained no reference to prior art showing the use of any of the pre-existing screw holes on the Winchester 94. Thus, the patent examiner was not cognizant of extremely relevant prior art.
 
 F. Letter to Patent and Trademark Office
 
 36
 As stated above, since the 1940's the left side of the Winchester 94 rifle's receiver has featured two screw holes (filled by plug screws) to facilitate attachment of a receiver sight. That these two screw holes were so utilized was well known in the industry and by Kwik-Site principals Rubin and Jiminez. In conjunction with its application for the '800 patent, however, Kwik-Site stated in a letter to the Patent and Trademark Office:
 
 
 37
 Claim has the improvement of the utilization of the already existing screw holes formed in the conventional side receiver cover plate of the rifle for mounting the bar. Conventionally, such a bar is mounted by drilling new holes in the side plate of the rifle. Applicant conceived the idea of arranging the holes in the bar in alignment with the pre-existing holes in the side plate which are already being used to receive screws for fastening the side receiver plate to the rifle structure. Thus, by merely removing the existing screws and using longer ones to pass through the aligned bar and receiver plate holes, the longer screws mount both the bar and the receiver plate to the rifle structure, completely eliminating the need for drilling and tapping new holes in the receiver plate. While this concept may seem extraordinarily simple in retrospect, it appears to be a novel concept, something which applicants who are in the gun shop business have never seen or heard of before and is a considerable money and time saver to the rifle owner.
 
 
 38
 Williams [patent number 2,854,748] describes only the use of screws and screw holes to mount the bar to the side of the rifle, but does not suggest the use of the already existing receiver plate screw holes to mount both the bar and the receiver together onto the rifle structure.
 
 
 39
 Clear View correctly contends this letter contained material inaccuracies that misled the patent examiner. For example, in the letter Kwik-Site incorrectly implied the receiver screw holes had never been used for mounting a telescopic sight despite the existence of the Boone scope, which mounts in the Winchester 94's two rear screw holes. Kwik-Site erroneously stated that the rifle's three receiver screws existed to attach the receiver plate to the rifle structure and failed to disclose that the very purpose of the two rear screw holes was to mount receiver sights. (Tr. 5/13/82 at 43). Kwik-Site's description of the Winchester 94 as having a side receiver cover plate was false and probably misleading. As uncontradicted evidence at trial showed, the Winchester 94 rifle does not have a receiver cover plate and, consequently, there are no screws that fasten the side receiver plate to the rifle structure. (Tr. 5/13/82 at 32, 217-21; 5/14/82 am at 39).
 
 
 40
 Despite these errors in the letter, the district court did not accept Clear View's argument that the Patent and Trademark Office had been deceived; the court held that these omissions and erroneous statements did not constitute fraud on the Patent and Trademark Office. The district court reasoned that references to a non-existent "side receiver cover plate" were "mere technical misstatements" and that Kwik-Site's failure to mention the Boone scope and receiver sights that used the two rear screw holes was of no significance. Finally, the trial court incorrectly found that the '800 file wrapper mentioned a prior "Williams mount" and its use of the two rear screw holes, and thus held that the Patent and Trademark Office was aware of the prior use of the two rear screw holes. (Jt.App. 240; Tr.Ct.Opin. 17).
 
 G. Clearly Erroneous Factual Findings
 
 41
 It is unnecessary for this court to analyze the correctness of all the trial court's factual findings, but we do call attention to two significant clearly erroneous findings. First, the district court mistakenly concluded that Kwik-Site's failure to mention certain prior art was rectified by the fact that the '800 file wrapper mentioned "the Williams mount and its use of the two screw holes in the Winchester 94." (Jt.App. 240, Tr.Ct.Opin. 17). This is factually incorrect; the '800 file wrapper mentioned two Williams mounts, neither of which utilized the Winchester 94's pretapped screw holes. We find that no prior art cited to the Patent and Trademark Office by Kwik-Site revealed the existence, purpose or prior use of any of the pre-existing screw holes. Second, the district court wrongly concluded that although the Boone scope and the peepsite utilized the two rear screw holes, they still required the services of a gunsmith to drill "more holes" in the receiver. (Jt.App. 235, Tr.Ct.Opin. 12). This, too, is incorrect; evidence at trial established that the Boone scope and certain receiver sights attached to the Winchester 94 via use of only the two rear screw holes--no drilling or tapping of a third hole was required.
 
 H. Legal Analysis
 
 42
 The '800 patent ordinarily is entitled to a statutory presumption of validity, 35 U.S.C. Sec. 282; but where, as here, the most relevant prior art was not before the patent examiner, that presumption is "largely, if not wholly, vitiated." American Seating Co. v. National Seating Co., 586 F.2d 611, 615 (6th Cir.1978), cert. denied, 441 U.S. 907, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). The district court mistakenly concluded that the Patent and Trademark Office was aware of the relevant prior art. Based on the preceding analysis, we find that the Patent and Trademark Office was not aware of the relevant prior art and hold that the combination of Kwik-Site's misleading letter plus the patentees' failure to cite the most relevant prior art clearly destroyed any statutory presumption of validity that the '800 patent otherwise would have enjoyed.
 
 
 43
 A further legal error was committed when the district court compared Kwik-Site's Side Mount 94 to the prior art, instead of comparing claim 5 itself to the prior art. "[T]he scope of protection granted by a patent is defined by the language of its claims rather than by its title, specifications, exhibits or by the commercial embodiments of the claimed invention." MacLaren v. B-I-W Group, Inc., 535 F.2d 1367, 1372 (2d Cir.1976) (emphasis added). A patent's claims, not what is asserted in subsequent litigation, define the scope of the patented invention. Philips Industries, Inc. v. State Stove & Manufacturing Co., 522 F.2d 1137, 1140 (6th Cir.1975) (quoting Ohio Citizens Trust Co. v. Lear Jet Corp., 403 F.2d 956, 958 (10th Cir.1968), cert. denied, 394 U.S. 960, 89 S.Ct. 1308, 22 L.Ed.2d 561 (1969)).
 
 
 44
 Our review of the prior art establishes that claim 5 reads directly on the prior art, which used the Winchester 94's pre-existing screw holes to mount both receiver sights and the Boone scope. However, the district court, looking to the commercial embodiment of the claimed invention, found the '800 patent valid by virtue of its use of all three pre-existing screw holes on the 94 receiver. With this we disagree. Claim 5 of the '800 is written broadly and does not specify the number of receiver screw holes used to mount the invention onto the Winchester 94 rifle.[3] Nor can one ascertain by reference to the Winchester 94 how many screw holes the patented invention claims to use, because the Winchester 94 has no receiver plate cover and, consequently, no screws to attach the receiver plate cover to the rifle structure. Although the illustrating figures in the '800 patent show the use of three screw holes, an invention cannot "be saved by features which appear only in the figures and are not mentioned in the text." MacLaren v. B-I-W Group, Inc., 535 F.2d at 1373 (citation omitted). Even though a new, useful and non-obvious invention might have been claimed within proper limits, once a patent containing overly broad claims is issued, it cannot be saved from invalidation by a court's in substance re-writing the claims to restrict the patent to the more limited invention that might properly have been claimed. Id. "It is not the responsibility of the courts to remedy the deficiencies in patent claims which might have been avoided by a more careful preparation and presentation to the Patent Office." Id. (quoting Henry J. Kaiser Co. v. McLouth Steel Corp., 257 F.Supp. 372, 442 (E.D.Mich.1966), aff'd., 400 F.2d 36 (6th Cir.1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969)). Accordingly, we reverse the district court and hold claim 5 invalid.[4]
 
 IV. Unfair Competition under the Lanham Act
 
 45
 In its complaint, Kwik-Site alleged that Clear View engaged in unfair competition in violation of the section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a), by persuading customers to purchase Clear View's scope mounts in place of Kwik-Site's scope mounts. The complaint alleged that Kwik-Site personnel conducted periodic sales demonstrations at its customers' facilities for the purpose of creating a market for Kwik-Site scope mounts. Allegedly, Clear View personnel also attended these promotional demonstrations and persuaded end user customers to substitute Clear View's lower priced copies in place of Kwik-Site's patented telescopic sight mounts. This alleged deception led consumers to purchase Clear View's product in the erroneous belief that they were purchasing the previously demonstrated Kwik-Site mounts. According to the complaint, Clear View's actions constituted palming off in violation of the Lanham Act. Kwik-Site also charged that Clear View attempted to obtain information on Kwik-Site's activities, sources, and customers from Kwik-Site president Ivan Jiminez, suppliers, customers and other salesmen in an attempt to misappropriate Kwik-Site's trade secret information.
 
 
 46
 The district court held that Clear View had violated the Lanham Act by selling products known to infringe Kwik-Site patents. The district court based its finding of liability solely on its determination that Clear View knew at the time it designed and sold its Clear View Side Mount 94 and Clear View See Through Mount that Kwik-Site had previously patented those same items. This unauthorized use of Kwik-Site's patented devices was held to be "a clear violation of the Lanham Act." (Jt.App. 249-50, Tr.Ct.Opin. 26-27). On the contrary, we find no authority for the proposition that willful infringement of a patent, if such were present, would, as the district court held, ipso-facto be a violation of the Lanham Act. We therefore look to determine whether there is valid evidence for such a violation.
 
 A. Elements of a Lanham Act Claim
 
 47
 In enacting the Lanham Act, Congress intended "to regulate commerce within [its control] by making actionable the deceptive and misleading use of marks in such commerce; ... to protect persons engaged in such commerce against unfair competition; [and] to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits or colorable limitations of registered marks." 15 U.S.C. Sec. 1127. See Federal-Mogul-Bower Bearings, Inc. v. Azoff, 313 F.2d 405 (6th Cir.1963). Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a), which is at issue here, provides in pertinent part:
 
 
 48
 (a) Any person who shall affix, apply or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
 
 
 49
 To establish a violation of section 43(a), a plaintiff must prove: "(1) that the trade dress or product configuration of the two competing products is confusingly similar; (2) that the appropriated features of the trade dress or product configuration are primarily non-functional; and (3) that the trade dress or product configuration has obtained secondary meaning." Litton Systems, Inc. v. Whirlpool Corp., 728 F.2d 1423, 1444-45 (Fed.Cir.1984) (citing cases).
 
 
 50
 In assessing whether there is a likelihood of confusion under section 43(a), this circuit has articulated the relevant factors to be evaluated: (1) the degree of similarity between the marks; (2) the similarity of goods or services for which the marks are used; (3) the area and manner of concurrent use; (4) the strength of the mark; (5) the sophistication of the purchasers; (6) plaintiff's intent; (7) and any instances of actual confusion. Induct-O-Matic v. Inductotherm Corp., 747 F.2d 358, 361 (6th Cir.1984) (citing Frisch's Restaurants, Inc. v. Elby's Big Boy, 670 F.2d 642, 648 (6th Cir.1982)). See also Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831, 833 (6th Cir.1983). Additionally, when determining whether likelihood of confusion exists, it is a foundation principle that " '[t]he most common and effective means of apprising intending purchasers of the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name * * * [and when that is done], there is no basis for a charge of unfair competition.' " Litton Systems, Inc. v. Whirlpool Corp., 728 F.2d at 1446 (quoting Venn v. Goedert, 319 F.2d 812, 816 (8th Cir.1963)).
 
 
 51
 On review by an appellate court, a trial court's evaluation of each of the factors listed above is a finding of fact reviewable under the clearly erroneous standard. Frisch's Restaurants, Inc., 670 F.2d at 651 (adopting the standard of Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc., 616 F.2d 440, 443-44 (9th Cir.1980)). But, the further determination of likelihood of confusion based on these factors is a legal conclusion, not subject to the clearly erroneous standard. Frisch's Restaurants, Inc., 670 F.2d at 651. See also Litton Systems, Inc. v. Whirlpool Corp., 728 F.2d at 1445-46 & n. 1 (discussing which standard the Federal Circuit will adopt in Lanham Act cases).
 
 
 52
 B. Parties' Agreement that No Confusion Involved
 
 
 53
 Before analyzing section 43(a) in light of the instant case, this court feels constrained to note that at trial Kwik-Site appeared to concede there was no confusion between its mounts and Clear View's mounts. On cross-examination, Kwik-Site principal Ivan Jiminez was being questioned about the manner in which Kwik-Site and Clear View packaged their mounts, when the following exchange occurred:
 
 
 54
 The Court: Is there a claim for pawning [sic] off?
 
 
 55
 Mr. Chandler (Clear View atty.): They're accused--they've charged confusion. The customer is being confused between this [Clear View] product and his [Kwik-Site's] product, and apparently it's based on taking [the mount] out of the package.
 
 
 56
 The Court: But there isn't any claim in the Complaint as to confusion, it's just a patent infringement.
 
 
 57
 Mr. Williams (Kwik-Site atty.): There's no claim for confusion.
 
 
 58
 Mr. Chandler: We'll stipulate there's no claim for confusion.
 
 
 59
 (Tr. 5/14/82, am, at 61).
 
 
 60
 In spite of this exchange, the district court found Clear View violated section 43(a). Apparently equating a finding of willful patent infringement with a finding of liability under the Lanham Act, the court devoted only two brief paragraphs to analysis of Kwik-Site's Lanham Act claim. The court did not address the factors set out above and made no findings regarding the likelihood of confusion. Despite the district court's failure to make factual findings, this court has determined as a matter of law that Clear View's actions did not constitute unfair competition in violation of section 43(a), 15 U.S.C. Sec. 1125(a).
 
 C. No Likelihood of Confusion
 
 61
 Uncontradicted evidence established that Kwik-Site marketed its mounts in small white boxes, while Clear View marketed its mounts in transparent blister packs attached to orange and white cardboard cards visibly marked with Clear View's name and logo. (Tr. 5/14/82, am, at 57-60). On appeal Kwik-Site contends there was evidence at trial that distributors returned Clear View mounts to Kwik-Site in the erroneous belief that the mounts were Kwik-Site mounts. Kwik-Site does not identify where in the record this testimony can be found, and this court's careful reading of the almost one thousand page transcript disclosed no such testimony. Kwik-Site's president Irving Rubin did testify that Kwik-Site put its identifying logo on its mounts but did not mark its products with a patent number. (Tr. 5/4/82, pm, at 40-42). Mr. Rubin also testified that Kwik-Site's brochures displayed the appropriate patent numbers beside the pictures of its mounts; a Kwik-Site brochure introduced at trial, however, showed no patent numbers. (Tr. 5/14/82, pm, at 82). There was no evidence to substantiate Kwik-Site's allegations that Clear View personnel attended product demonstrations conducted by Kwik-Site and either enticed customers at such demonstrations to purchase Clear View mounts rather than Kwik-Site mounts or misled customers to buy Clear View mounts when such customers believed they were buying Kwik-Site mounts.
 
 
 62
 In finding Clear View violated section 43(a) of the Lanham Act, the district court inappositely cited Deyerle v. Wright Manufacturing Co., 496 F.2d 45 (6th Cir.1974), for the proposition that Clear View's willful infringement of Kwik-Site's patents, accompanied by Clear View's sale of the infringing products, constituted a violation of section 43(a). In Deyerle, defendant Wright Manufacturing Company had counterfeited plaintiff Deyerle's patented device, advertised and sold the counterfeits as Deyerle products and identified the counterfeits with the Deyerle patent number. The Sixth Circuit upheld the trial court's finding that Wright's unauthorized use of the Deyerle name and patent number was "calculated to confuse and mislead the public and, therefore, unfair competition under the Lanham Act, 15 U.S.C. Sec. 1125(a)." Id. at 54 (footnote omitted).
 
 
 63
 None of the overtly flagrant circumstances found in Deyerle are present in the instant case. There is no evidence that Clear View marketed or advertised its mounts in a fashion that would confuse or mislead consumers into believing they were purchasing Kwik-Site mounts. In fact, far from attempting to palm off its mount as being of Kwik-Site origin, it is uncontested that Clear View was the first scope mount manufacturer to utilize the blister pack for marketing its products and that this feature enhanced its products' attractiveness to distributors and consumers. (Tr. 5/19/82, at 51; Exhibits 19, 48).
 
 
 64
 Under the circumstances presented here, we reverse the district court and hold that Kwik-Site failed to establish any violation of section 43(a) of the Lanham Act.
 
 V. Treble Damages
 
 65
 The district court found that "the wilfulness of defendant [Clear View]'s infringement of plaintiff [Kwik-Site]'s patents also requires this court to award plaintiffs treble damages as provided in the Patent statute at 35 U.S.C. Sec. 284." Because we have found that both Kwik-Site's D.'674 patent and '800 patent are invalid, we reverse the trial court's award of treble damages.
 
 CONCLUSION
 
 66
 To summarize, we affirm the district court's grant of Clear View's motion for summary judgment holding Clear View patent D.'309 valid and infringed and the award of damages. We reverse the district court's holdings that Kwik-Site patents D.'674 and '800 are valid and infringed and hold both D.'674 and '800 invalid. We reverse the district court's finding that Clear View violated the Lanham Act, 15 U.S.C. Sec. 1125(a). We reverse the district court's award of treble damages pursuant to 35 U.S.C. Sec. 284. The case is hereby remanded to the district court for dissolution of the injunction and for further proceedings consistent with this opinion.
 
 
 67
 GEORGE CLIFTON EDWARDS, Jr., Circuit Judge, concurring in part and dissenting in part.
 
 
 68
 I concur in Judge Brown's opinion in this case with the exception of that portion which upholds the validity of the Clear View Manufacturing Patent No. D.'309. My review of this record shows that it does not pass the statutory test of novelty, utility and nonobviousness, particularly the last of these three. See Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 693-694, 15 L.Ed.2d 545 (1966).
 
 APPENDIX
 
 69
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 *
 The Honorable George C. Edwards took senior status January 15, 1985
 
 
 **
 The Honorable David D. Dowd, Jr., District Judge, United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 In accordance with local rules, this summary judgment motion was served on Kwik-Site with a request for a statement from Kwik-Site whether it concurred in the grant of the motion. Kwik-Site failed to concur, and over a month later Clear View gave notice to Kwik-Site that Clear View would request a hearing which was subsequently set
 
 
 [2]
 A receiver sight (also called a peepsight) is a quick sighting device that mounts on the back of a rifle, close to the shooter's eye. Unlike the patented device, a receiver sight does not function as a mount for a telescopic sight, nor does a receiver sight magnify the target. (Tr. 5/13/82 at 43-45)
 
 
 [3]
 It is undisputed that the patented device was intended specifically to be used only with the Winchester 94 rifle
 
 
 [4]
 Since we hold the '800 patent invalid, it is not necessary to determine whether Clear View's Side Mount 94 would infringe. This mount does make use of the three screw holes for mounting a telescopic sight on a Winchester 94. However, as noted, since there is no side receiver cover plate on a Winchester 94, and since the longer screws therefore are not used to attach Clear View's Side Mount 94 while simultaneously attaching a side receiver cover plate to the rifle, claim 5 does not read directly on the accused device, and therefore there could be no literal infringement